CENTRAL RAILROAD OF NEW JERSEY v. MAYOR AND ALDERMEN OF JERSEY CITY.

Argued June 8, 1903—Decided November 9, 1903.

1. The agreement of 1833 between the commissioners representing the States of New Jersey and New York, having been confirmed by the legislatures of those states, respectively, and approved by the congress of the United States, established the boundary line between this state and the State of New York in the middle of the Hudson river and of the bay of New York.
2. The sovereignty of the State of New Jersey is co-extensive with the territorial limits thus established, subject only to such exceptions and to such extra-territorial jurisdiction as was by the said agreement conceded to the State of New York.
3. The word "jurisdiction" is not used in article 3 of this agreement in the sense of sovereignty.
4. The power to tax the lands under the tidewater of New York bay, within the territorial limits established by the agreement of 1833, is in the State of New Jersey.

On *certiorari.*

The following statute contains the text of the agreement or treaty (so called) of 1833 between the States of New Jersey and New York:

"An act to ratify and confirm an agreement made between the commissioners appointed by the governor of the State of New York and the commissioners appointed by the governor of the State of New Jersey, respecting the territorial limits and jurisdiction between the said states.

"Passed February 26th, 1834.

"Whereas, commissioners duly appointed on the part of the

State of New York and commissioners duly appointed on the part of New Jersey, for the purpose of agreeing upon and settling the jurisdiction and territorial limits of the two states, have executed certain articles, two copies for each state, which are contained in the following words:

"Agreement made and entered into, by and between Benjamin F. Butler, Peter Augustus Jay and Henry Seymour, commissioners duly appointed on the part and behalf of the State of New York, in pursuance of an act of the legislature of the said state, entitled 'An act concerning the territorial limits and jurisdiction of the State of New York and the State of New Jersey,' passed January 18th, 1833, of the one part, and Theodore Frelinghuysen, James Parker and Lucius Q. C. Elmer, commissioners duly appointed on the part and behalf of the State of New Jersey, in pursuance of an act of the legislature of the said state, entitled 'An act for the settlement of the territorial limits and jurisdiction between the States of New Jersey and New York,' passed February 6th, 1833, of the other part.

"3. Art. I. The boundary line between the two States of New York and New Jersey, from a point in the middle of the Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the bay of New York, of the water between Staten Island and New Jersey, and of Raritan bay to the main sea, except as hereinafter otherwise particularly mentioned.

"4. Art. II. The State of New York shall retain its present jurisdiction of and over Bedlow's and Ellis' islands, and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned and now under the jurisdiction of that state.

"5. Art. III. The State of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York and of and over all the waters of the Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvel creek, and of and over the lands

covered by the said waters to the low water-mark on the westerly or New Jersey side thereof, subject to the following rights of property and jurisdiction of the State of New Jersey, that is to say:

"1. The State of New Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the bay of New York and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey.

"2. The State of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the quarantine or health laws and laws in relation to passengers of the State of New York, which now exist or which may hereafter be passed.

"3. The State of New Jersey shall have the exclusive right of regulating the fisheries on the westerly side of the middle of said waters; providing that the navigation be not obstructed or hindered.

"6. Art. IV. The State of New York shall have exclusive jurisdiction of and over the waters of the Kill von Kull, between Staten Island and New Jersey, to the westermost end of Shooter's Island, in respect to such quarantine laws and laws relating to passengers as now exist, or may hereafter be passed under the authority of that state, and for executing the same; and the said state shall also have exclusive jurisdiction, for the like purposes, of and over the waters of the sound from the westermost end of Shooter's Island to Woodbridge creek, as to all vessels bound to any port in the said State of New York.

"7. Art. V. The State of New Jersey shall have and enjoy exclusive jurisdiction of and over all the waters of the sound between Staten Island and New Jersey, lying south of Woodbridge creek, and of and over all the waters of Raritan bay, lying westward of a line drawn from the lighthouse at Prince's bay to the mouth of Matavan creek, subject to the

following rights of property and jurisdiction of the State
of New York, that is to say:

"(1) The State of New York shall have the exclusive
right of property in and to the land under water lying be-
tween the middle of said waters and Staten Island.

"(2) The State of New York shall have the exclusive
jurisdiction of and over the wharves, docks and improvements
made and to be made on the shore of Staten Island, and of
and over all vessels aground on said shore or fastened to
any such wharf or dock, except that the said vessels shall
be subject to the quarantine or health laws and laws in
relation to passengers of the State of New Jersey which
now exist or which may hereafter be passed.

"(3) The State of New York shall have the exclusive right
of regulating the fisheries between the shore of Staten Island
and the middle of the said waters; provided, that the navi-
gation of the said waters be not obstructed or hindered.

"8. Art. VI. Criminal process issued under the authority
of the State of New Jersey against any person accused of an
offence committed within that state, or on board of any
vessel being under the exclusive jurisdiction of that state
as aforesaid, or committed against the regulations made or
to be made by that state in relation to the fisheries men-
tioned in the third article; and also civil process issued
under the authority of the State of New Jersey against any
person domiciled in that state, or against property taken
out of that state to evade the laws thereof, may be served
upon any of the said waters within the exclusive jurisdiction
of the State of New York, unless such person or property
shall be on board a vessel aground upon or fastened to the
shore of the State of New York or fastened to a wharf ad-
joining thereto; or unless such person shall be under arrest
or such property shall be under seizure by virtue of process
or authority of the State of New York.

"9. Art. VII. Criminal process issued under the authority
of the State of New York against any person accused of an
offence committed within that state, or committed on board

of any vessel being under the exclusive jurisdiction of that state as aforesaid, or committed against the regulations made or to be made by that state in relation to the fisheries mentioned in the fifth article; and also civil process issued under the authority of the State of New York against any person domiciled in that state, or against property taken out of that state to evade the laws thereof, may be served upon any of the said waters within the exclusive jurisdiction of the State of New Jersey, unless such person or property shall be on board a vessel aground upon or fastened to the shore of the State of New Jersey, or fastened to a wharf adjoining thereto, or unless such person shall be under arrest or such property shall be under seizure by virtue of process or authority of the State of New Jersey.

"10. Art. VIII. This agreement shall become binding on the two states when confirmed by the legislatures thereof, respectively, and when approved by the congress of the United States.

"Done in four parts (two of which are retained by the commissioners of New York, to be delivered to the governor of that state, and the other two of which are retained by the commissioners of New Jersey, to be delivered to the governor of that state), at the city of New York, this sixteenth day of September, in the year of our Lord one thousand eight hundred and thirty-three, and of the independence of the United States the fifty-eighth.

"THEODORE FRELINGHUYSEN,    B. F. BUTLER,

"JAMES PARKER,    PETER AUGUSTUS JAY,

"LUCIUS Q. C. ELMER,    HENRY SEYMOUR.

"Therefore, that the aforesaid agreement, and every article, clause, matter and thing therein contained, shall be and the same is hereby fully and amply ratified and confirmed on the part of the State of New Jersey.

"Confirmed by New York February 5th, 1834.

"Approved by the congress of the United States June 28th, 1834.

"Revision of New Jersey, 1877, p. 1178."

Before Justices GARRISON, GARRETSON and SWAYZE.

For the prosecutor, *John L. Conover, Frank Bergen, William D. Edwards* and *George Holmes.*

For the defendants, *Robert Carey* and *George L. Record.*

The opinion of the court was delivered by ·

GARRISON, J.   This writ brings up for review the taxes levied by Jersey City for the year 1899 upon certain lands of the prosecutor lying between the middle of New York bay and its low-water line on the New Jersey shore.   A single reason for annulling this tax is now pressed by the prosecutor, which is thus stated in the brief of counsel:

"The prosecutor insists that the land under water included in these lots and separately assessed for taxation is not subject to taxation by the taxing officers of Jersey City for the reason that it is not within the jurisdiction of New Jersey, although within the geographical boundaries of the state.

"There may be some question as to the technical boundaries of Jersey City under the various acts of the legislature creating the city and its constituent parts, but the prosecutor raises no such question at this time.

"The question in this case depends upon the interpretation of article 3 of the compact or agreement made by the States of New York and New Jersey on September 16th, 1833, and confirmed by the legislature of both states and approved by congress in· 1834."

The compact thus referred to came into existence in this way:   The grant by Charles II. to James, Duke of York, made in 1664, included the colonies of New York and New Jersey.   James, being .thus vested with both governmental and proprietary rights on each side of the waters that separated the two colonies, granted to Berkeley and Carteret New Jersey, describing it as "all that tract of land adjacent to New England and lying and being to the west of Long Island and Manhitas Island, and bounded on the east by the main

sea and part of Hudson's river, and hath upon the west the Delaware bay and to the northward as far as the northernmost branch of said bay or the river of Delaware, which is forty-one degrees and forty minutes of latitude, and crosses over thence in a straight line to Hudson's river in forty-one degrees of latitude."

The point in this description to be noted is that New Jersey was bounded on the east by navigable water. Later, in 1674, after the Dutch restoration, these grants were renewed under the same description. In 1676, the *quinti-partite* deed was made by the grantees of James and their co-tenants to Sir George Carteret for the easterly part of the premises granted by James to Berkeley and Carteret, and in this instrument the land is described as "extending eastward and northward along the seacoast and the river called Hudson's river." In 1682, the widow of Carteret and others granted and released their interest to William Penn and eleven others, in which conveyance the land was described as in the *quinti-partite* deed; and in the year following the Duke of York released to twenty-four proprietors any interest he might have in the territory, which was described as "bounded east by Hudson river." Later came the successful war of the revolution, from which the colonies of New York and New Jersey emerged as free and sovereign states. From the facts thus epitomized there arose a controversy between the two states, based not upon any radical difference of opinion as to the effect of the grants that had been made during the colonial period, but rather upon divergent views as to the effect upon state sovereignty of the revolution itself.

The view advanced on behalf of New Jersey took, in 1806, the form of a statute, passed in that year, which, after reciting the historical facts above stated, declared, as their result, that "the State of New Jersey became invested with full right and lawful authority to exercise jurisdiction in and over the Hudson river and the main sea and all the ports, harbors and havens lying adjacent to and along the

Jersey shore and coast in such manner as belongs to a sovereign and independent state to use and exercise." *Bloomf. L., p.* 74. Under this statute commissioners were appointed to meet with commissioners to be appointed by New York to make an agreement to settle and determine the eastern boundary line of the State of New Jersey. Such a commission was appointed by New York, and met with the New Jersey commissioners, at Newark, in 1807, but no agreement was reached. Other conferences were held with like effect and sundry statutes were passed with a view of provoking an issue that might lead to a settlement of the questions involved. In 1829, no agreement having been reached, New Jersey filed a bill against New York in the Supreme Court of the United States, a summary of which may be found in 108 *U. S.* 406, 410. No appearance to this suit was ever entered by the State of New York, although efforts were made to compel such action upon her part. 3 *Pet.* 461; 5 *Id.* 283; 6 *Id.* 323. This bill was dismissed on February 15th, 1836, three years after the confirmation by each state of the so-called treaty of 1833.

From this summary may be gathered the general nature of the controversy between the two states as it stood in 1833, and of the nature and grounds of the claims advanced on behalf of each. What is chiefly to be noted is that each state bottomed its right upon an essential claim of sovereignty, which, on behalf of New York, was deduced from the one-time union of sovereignty and property in the Duke of York, and, on behalf of New Jersey, from the successful revolution against the king.

On the 6th of February, 1833, "An act for the settlement of the territorial limits and jurisdiction between the State of New Jersey and New York" was passed by the legislature of this state. *Pamph. L.* 1833, *p.* 54. The language of this statute has so important a bearing upon the compact that grew out of it that its full text is given:

"An act for the settlement of the territorial limits and jurisdiction between the States of New Jersey and New York.

"Whereas the legislature of the State of New York have recently passed a law authorizing the governor of that state to appoint commissioners to meet commissioners on the part of this state, to negotiate and agree respecting the territorial limits and jurisdiction of the State of New Jersey and the State of New York;

"And whereas it is expedient and desirable that the difference heretofore existing on this subject should be amicably and speedily adjusted; therefore,

"Sec. 1. Be it enacted by the council and general assembly of this state, and it is hereby enacted by the authority of the same, that the governor of this state or the person administering the government of the same, be, and he is hereby authorized to appoint three commissioners, with full power on the part of New Jersey, to meet commissioners, appointed or to be appointed under or by virtue of a law of New York, passed January the eighteenth, eighteen hundred and thirty-three, and with them to negotiate and agree respecting the territorial limits and jurisdiction between the said states as to them may seem just; and if by death, resignation, or otherwise, a vacancy do happen among those appointed by the State of New Jersey, the governor, or person administering the government of this state, is hereby authorized to supply the same.

"Sec. 2. And be it enacted, that the said commissioners on the part of the State of New Jersey, or a major part of them, shall have full power and authority to agree upon, settle and determine the limits of territory and jurisdiction between the said states, as to them may seem just; and their agreement in the premises, in writing, signed and sealed by the said commissioners of both states, or a majority of them, respectively, if made on or before the first Tuesday of January next, shall become binding on this state, when confirmed by the respective legislatures of New Jersey and New York and approved by congress.

"Sec. 3. And be it enacted, that the said commissioners shall meet at such time and place as they may agree upon, and shall each be entitled to receive five dollars per day for

every day they may be employed in discharging .their duties under this act, and fifteen cents per mile for every mile they shall necessarily travel in going to, and returning from, any meeting of the said commissioners, to be paid by the treasurer, on the warrant of the governor or the person administering the government of this state.

"Sec. 4. And be it enacted, that the governor or person administering the government of this state, shall transmit to the governor of New York a copy of this act.

"Passed February 6th, 1833." *Pamph. L.* 1833, *p.* 54.

A statute of like import and in almost identical language was passed at about the same time by the assembly of New York.

The commissioners appointed on behalf of New Jersey, Theodore Frelinghuysen, James Parker and Lucius Q. C. Elmer, met with those appointed on behalf of New York, and in September of that same year came to an agreement that was reduced by the commissioners to the form of written articles that were to be binding upon the two states when confirmed by the legislatures thereof, respectively, and approved by the congress · of the United States. Such confirmation and such approval followed in due course. *Laws of N. Y.* 1834, *p.* 8; *Pamph. L.* 1834, *p.* 118; 4 *U. S. Stat. at L., p.* 808.

The articles constituting this compact are printed in full in a prefatory statement to this opinion, and the interpretation of their language, in so far as it bears upon the right of New Jersey to exercise the sovereign power of taxation over the lands of the prosecutor, is the sole question now presented for decision.

The question is one of first impression, being entirely distinct from the right to exercise civil or criminal jurisdiction, which has hitherto been the only aspect in which the compact has been presented for judicial consideration. With respect to the right last mentioned, namely, that of administering jurisprudence over the territory declared by the compact of 1833 to be within the boundaries of the State of New Jersey, it was held by this court, in the case of *State* v. *Babcock,* 1

*Vroom* 29, that an indictment for a nuisance by placing wrecks in the Hudson river below low water-mark on the New Jersey shore would not lie in this state, upon the ground that by the compact in question exclusive jurisdiction over offences in or upon the said waters or the land under them resided in the State of New York. Later, the Court of Appeals of the State of New York, in the case of *People* v. *Central Railroad of New Jersey,* 42 *N. Y.* 283, held that the courts of New York had no jurisdiction to abate by injunction nuisances extending out into the bay or river from the New Jersey shore, upon the ground that by the compact in question the jurisdiction conferred upon New York over the waters of the bay and river was a qualified and limited jurisdiction for police and sanitary purposes, or to protect the interests of commerce, and was not designed to give to New York any right to interfere with the complete political or governmental jurisdiction of New Jersey as a sovereign state over her own soil and its appurtenances, and of and over every description of property within her territorial limits, which ruling was followed by the same court in 1891, in the case of *Ferguson* v. *Ross,* 126 *N. Y.* 459. In the case in 42 *N. Y.,* two of the seven judges who constituted the court dissented upon the main proposition upon which the case was decided. This dissent was voiced by Chief Justice Earl, and is summed up in the proposition elaborated in his dissenting opinion that the word "jurisdiction," in article 3 of the compact of 1833, was used as synonymous with sovereignty, and not as a term of jurisprudence. The five judges who made up the majority of the court not only decided that the word "jurisdiction" was used as a term of jurisprudence, but held, further, that it was designed to. confer only a qualified and limited juridical authority of the sort that is above described in language taken from the prevailing opinion. It is not now necessary or proper to decide whether the term was employed by the commissioners in a broad juridical sense or with the qualified meaning placed upon it by the majority opinion of the New.

York court. All that is to the present purpose is that its equivalency to sovereignty or governmental jurisdiction was distinctly disavowed, and that the position there taken by the two dissenting judges is the position that must be now successfully maintained by the plaintiff in *certiorari*. The present case, in fact, turns upon the precise point developed by the divergent views expressed in the New York case, namely, whether the word "jurisdiction" was used in article 3 of the compact of 1833 as equivalent to state sovereignty or in a less inclusive sense. The reasons, *pro* and *con*, elaborated in the opinions to which reference has been made, need not be here repeated. There is, however, one view of the matter not touched upon in either of these opinions that greatly strengthens, in my judgment, the position taken in the majority opinion.

The brief historical review of the controversy between the two states has made it apparent that the question at issue between them was in its ultimate essence one of sovereignty, and that the settlement of this question was the one pressing matter, although other questions were to be settled as well. That this was recognized by each state in providing a *modus* of settlement is evident from the language of the statutes by which the respective commissioners were appointed and empowered. Upon this point the titles of these acts are suggestive, that of New York being "An act concerning the territorial limits and jurisdiction of the State of New York and the State of New Jersey," while that of New Jersey was "An act for the settlement of the territorial limits and jurisdiction between the States of New Jersey and New York," and in the enactments themselves the same duality of objects to be settled is at all times observed in the statutes in each state. In plain terms, therefore, the commissioners were empowered to negotiate respecting two things, and thereby to settle two things, namely, limits of territory and jurisdiction. Nowhere is there any intimation that those two were deemed to be one and the same thing. Bearing this fact in mind, and that the main point in con-

troversy was that of sovereignty, the compact itself may be read with a reasonable expectation that the main point submitted to the commissioners was not lost sight of, and also that both of the powers reposed in them were duly executed. This expectation is fully justified by the terms of the compact. Article 1, in clear and explicit language, fixed the boundary line between the states as the middle of the Hudson river and the bay of New York. This disposed of the question of territorial limits, and had this been the only matter submitted to the commissioners would have exhausted their authority in the premises. They were, however, empowered to deal also with jurisdiction. Hence the qualification with which article 1 concluded, "except as hereinafter otherwise particularly mentioned." To fulfill the conditions of this clause the matters to be particularly mentioned must be "otherwise"—that is, must alter or modify what has gone before; and secondly, must be capable of exception—that is, of subtraction from it—hence must be less than what had preceded. Articles 2 and 3 fulfill with precision each of these conditions, and from their position and context admit of no other rational interpretation than that they are the excepted matters to be particularly mentioned, by which the otherwise unqualified concession of territorial limit was to be modified and abridged. This was effected in article 2 by providing that New York should retain its jurisdiction over certain islands lying in the waters mentioned in article 1, while article 3 continued the subtracting process by stipulating that New York should enjoy exclusive jurisdiction over all the waters included within the territorial limits of New Jersey up to low water-mark on the New Jersey shore, subject to certain property rights and jurisdictions which are excepted in favor of New Jersey, which thus constituted an exception to an exception. The remaining articles are not directly pertinent.

It will have been noted that sovereignty, *eo nomine,* is not mentioned in these articles, and yet no one contends that it was not disposed of by them. There are, in fine, two declara-

tions contained in these articles, either of which may carry sovereignty, namely, territorial boundary and jurisdiction, the first by imperative implication, the other by signifying governmental jurisdiction, in which case it is a synonym for sovereignty.

The relation between the territorial limits of a state and its sovereignty is thus spoken of by Judge Cooley in the opening section of his work on *Constitutional Limitation:* "The sovereignty of a state commonly extends to all the subjects of government within the territorial limits occupied by the associated people who compose it, and, except upon the high seas, which belong equally to all men, like the air, and no part of which can rightfully be appropriated by any nation, the dividing line between sovereignties is usually a territorial line. In American constitutional law, however, there is a division of the powers of sovereignty between the national and state governments by subjects: the former being possessed of supreme, absolute and uncontrollable power over certain subjects throughout all the states and territories, while the states have the like complete power within their respective territorial limits over other subjects." *Cooley Const. Lim., p.* 2.

It is further a matter of common knowledge that in the creation of new states it is by the exact fixation of their territorial limits and not by the precise enumeration of their governmental powers that sovereignty arises and is exercised. Jurisdiction, as has been said, may mean governmental jurisdiction, as distinguished from juridical, in which case it is the exact equivalent of sovereignty. Either term, therefore, state boundary or state jurisdiction, may connote sovereignty, and under the one or the other of these heads the matter of sovereignty was unquestionably disposed of in the articles under consideration. Whatever divergency of view exists as to the force and effect of the compact in this respect must be ascribed to the elasticity of the term "jurisdiction." Regarded, however, as a synonym for sovereignty, which must be the contention here, the force of the word is greatly impaired in the present instance by the adjective "exclusive," as so

flagrant a redundancy as "exclusive sovereignty" should not lightly be imputed to the framers of these articles.

The grounds for thinking that sovereignty is disposed of under the head of "Territorial Limits" rather than under that of "Jurisdiction" are several and various. In the first place, the legislative direction to each set of commissioners was to deal with both territorial limits and jurisdiction, which was the merest tautology if the jurisdiction referred to was in itself sovereignty. In the next place, the commissioners did, in several instances, deal with jurisdiction in its juridical sense, a matter to which they were in nowise empowered, if the term "jurisdiction," used in the statutes under which they were appointed, was governmental. Furthermore, the facts that sovereignty was the main point at issue, that territorial limits preceded jurisdiction in the enumeration of the commissioners' authority and that the first article dealt conclusively with the question of territorial limits, are all indications that, in dealing with this power, the commissioners were settling the main point at issue. More conclusive still is the circumstance that, having in article 1 settled the matter of territorial limits, the jurisdiction with which the commissioners dealt was excepted from it, which is perfectly rational if the jurisdiction was juridical, and hence a mere incident of sovereignty; but was palpably irrational, not to say inconceivable, if jurisdiction was of itself that very sovereignty.

The significance of the title to the act confirming the agreement is to be noted, which, as well as the recitals, mentions jurisdiction as a distinct subject covered by the agreement. See prefatory note.

A further ground is the conclusive decision of the Court of Appeals of New York, adverse as it is, to the claim now advanced on behalf of the sovereignty of that state, pronounced first in the case of People *v.* Central Railroad Company of New Jersey, already cited, in which the present prosecutor was the successful defendant, and later affirmed by the same court in the case of *Ferguson* v. *Ross,* 126 *N. Y.* 459. In the earlier

cases, Justice Smith, announcing the reasoning of the court, said: "Whatever doubt may have existed before upon the subject, immediately upon the adoption and ratification of this convention or treaty the sovereignty and jurisdiction of the respective states extended and attached to that portion of the said river and other waters assigned to each state, respectively, by said article, up to the line of the boundary therein fixed and established;" and in the latter opinion, Judge Andrews, who spoke for a unanimous court, said: "The purpose of vesting exclusive jurisdiction over these waters in the State of New York was to promote the interests of commerce and navigation, which would, as supposed, be best subserved by giving to this state the exclusive control and regulation of the waters of the bay and harbor of New York." Indubitably, therefore, the State of New York, through its highest judicial tribunal, has expressly disowned any interpretation of the compact in question by which the sovereignty of New Jersey over the territorial limits granted by the compact of 1833 is to be in anywise impugned.

Lastly, due weight must be given to the statement of Judge Elmer, himself one of the commissioners, that what was conceded to the State of New York was "the exclusive jurisdiction over offences in and upon the waters or the land covered by the waters, outside of low water-mark." *State* v. *Babcock,* 1 *Vroom* 29. Indeed, it is not difficult to read between the lines of this extra-judicial statement that if the commissioners had not been empowered to deal with jurisdiction as distinct from sovereignty, and as a compensating factor for the concession New York was expected to make respecting territorial limits, it was in the highest degree improbable that any agreement whatsoever could have been reached. This suggestion, which is more than hinted at by Judge Elmer, explains much that is otherwise obscure, indicating, among other things, that the jurisdiction, touching which the commissioners negotiated, was neither sovereignty itself nor even such jurisdiction alone as is incident to sovereignty; but that it was, in great part, extra-terri-

torial jurisdiction, which was to be and was in fact conceded in return for reciprocal concessions. This *obiter* declaration of Judge Elmer, while not cited as authority for any position taken, is an added reason for holding that jurisdiction, as that term was employed by the commissioners, was not the equivalent of sovereignty, which is the precise point upon which the present litigation turns.

Opposed to these considerations stands the fact already alluded to, that jurisdiction, in a proper context, may imply sovereignty. Enough has been said, I think, to indicate that that circumstance, as applied to the present juncture, is entirely insufficient to withstand the array of reasoning and authority to the contrary, and that the jurisdiction that was conceded to New York over the land and waters within the territorial limits of New Jersey was not governmental.

From these considerations, the conclusions reached are that the agreement of 1833 between the commissioners representing the States of New Jersey and New York, having been confirmed by their respective legislatures and approved by the congress of the United States, established the boundary line between this state and the State of New York in the middle of the Hudson river and of the bay of New York, and that the sovereignty of the State of New Jersey is co-extensive with the territorial limits thus established, subject only to such extra-territorial jurisdiction of a juridical character as was by the said compact conceded to the State of New York, from which it results that the sovereign power of taxation over all the territory thus defined resides in the State of New Jersey.

These conclusions lead to the affirmance of the tax levied upon the lands of the prosecutor.