LEHIGH AND WILKES-BARRE COAL COMPANY, PROSECUTOR, PLAINTIFF IN ERROR, v. BOROUGH OF JUNCTION AND PETER S. SHURTS, COLLECTOR, DEFENDANTS, DEFENDANTS IN ERROR.

Submitted December 12, 1907—Decided March 2, 1908.

1. A Pennsylvania coal company established a coal storage plant in the State of New Jersey, about twenty miles. from the Pennsylvania line, and about fifty miles from tidewater. To this plant the coal company from time to time transported large quantities of coal, which was unloaded, deposited in a general mass and held *en masse* for an indeterminate period, subject to orders for future sale and delivery of specific quantities, and in general to regulate the supply. *Held*, that coal thus stored acquired a *situs* in New Jersey and became subject to local taxation.
2. To claim exemption from taxation under the protection of the commerce clause of the federal constitution there must be a continuous movement of merchandise in interstate commerce; that is, transportation from one state to another pursuant to some existing contract of sale or consignment.
3. Transportation of merchandise by the owner to his own order as consignee from one state to another for convenience of the owner, for the purpose of storage in mass and subsequent sale in specific quantities, is not interstate commerce in the sense that the merchandise is exempted from local taxation. Interstate transportation of coal not sold, but to be held indefinitely for a future market, is not such interstate commerce.
4. The findings of the Supreme Court upon questions of fact in this case are conclusive here. The act (*Pamph. L.* 1906, *p.* 658) authorizing a review of the facts upon *certiorari* is not applicable to this court.

On error to the Supreme Court.

The prosecutor, the Lehigh and Wilkes-Barre Coal Company, a Pennsylvania corporation, is engaged in the business of mining coal in Pennsylvania and shipping it across the State of New Jersey to tidewater, and thence to various markets in New York, New England and elsewhere.

The company established at Hampton Junction, New Jersey, a point about twenty miles over the Pennsylvania line and about fifty miles from tidewater, a depot for the reception and storage of coal. To this depot the company from time to time ships large quantities of coal to its own order as consignee. The coal, upon arrival at Junction, is mechanically unloaded and assorted according to sizes, and is intermingled with other coal there stored *en masse.*

The coal thus stored is owned and controlled by the company, and, according to the testimony of Mr. Baer, the president of the plaintiff in error, "the particular coal that was dumped at Hampton was not intended for any designated purchaser."

It otherwise appeared by testimony that no specific coal so deposited is shipped from the mines or held at the storage plant to fill any specific order, none of it, in point of fact, being sold or consigned to, or intended for, any particular party, but it remains there, at the will of the coal company, for an indeterminate period, longer or shorter, to meet future demands. It is only when orders are received for any designated kind and size of coal that it is taken from the common mass and shipped according to the terms of the order.

In a general way, under the view most favorable to the plaintiff in error, the coal thus stored is held to facilitate transportation and to keep customers supplied with coal during the year, this place, among others, being provided to keep a supply on hand to meet such and other demands. When the mines are shut down, as they frequently are, or when there is a requirement for a particular size of coal, the company draws upon the deposit at Junction. For example, in the fall and winter there is said to be a heavy demand for small sizes of coal, and it is impracticable, from the normal production of the mines, to keep pace with and supply all demands. The

facts are that the coal is accumulated at Hampton Junction to enable the coal company to regulate the supply.

According to the testimony of the prosecutor, the freight from the mines to the ultimate market is charged to and paid by the customer, but the fact is that, when the coal is shipped from the mines to this *entrepot* at Junction a freight of one dollar per ton is charged to and paid by the company. When the coal is sold through the sales offices in New York or Philadelphia the company adds to the price of the coal a freight charge from the mines to the point of ultimate delivery, and in this sense the freight from the mines to the market is paid by the customer.

The collector of the borough of Junction assessed one hundred thousand tons of coal on deposit at the storage plant of the prosecutor for state, county and borough taxes for the year 1905.

The coal company brought a *certiorari* to set aside, reverse and annul the assessment, and the Supreme Court affirmed the assessment.

The prosecutor sued out a writ of error and the question of the validity of the assessment is now presented for review.

For the plaintiff in error, *George Holmes.*

For the defendants in error, *William C. Gebhardt.*

The opinion of the court was delivered by

DILL, J.   The court below found as a fact that this coal was not *in transitu,* and drew the legal conclusion that it could not be deemed to be coal moving from one state to another in interstate commerce, and hence was taxable as part of the movable property within the state.

This court has no power to review the facts on *certiorari.* The act (*Pamph. L.* 1906, *p.* 658) authorizing the court to determine questions of fact has no application to the Court of Errors and Appeals.

This proposition has been repeatedly affirmed in cases where the statutes, of which the act in question is a revision,

have been construed. *Moran* v. *Jersey,* 29 *Vroom* 653; *Morris* v. *Mayor,* 33 *Id.* 385; *Harris* v. *Atlantic City,* 44 *Id.* 251.

Granting as a matter of fact that at the time of the taxation the coal in question was (for the time being) at rest and not in the strict sense of the word *in transitu,* nevertheless, the plaintiff in error claims that the stoppage or cessation of the transit was but temporary and was merely an incident of an interstate commerce journey previously commenced at the mines in Pennsylvania; that the interruption was but momentary to facilitate the transportation already begun by preventing a congestion of cars at tidewater and enabling the company to more promptly meet the demands of its customers.

On the other hand, it is contended that the journey of the coal from the mines of Pennsylvania to New York and New England was not one continuous journey with a temporary or incidental interruption, but the transportation of the coal was made by two journeys, the first from the mines to the Junction in New Jersey, a mere interstate transportation for the convenience of the owner in massing the property for future distribution and future sale; the second occurring after parcels of the property were sold and thereupon shipped from the Junction to the customer, this latter only being a transaction in interstate commerce.

It is true that there was a movement of the coal from one state to another, and if that movement was actually in the course of a continuous journey in interstate commerce, then the coal was not subject to local taxation.

Therefore, it seems to us that a question of law is to be determined, whether the movement of the coal was, under the facts and circumstances disclosed in the record, and in view of the finding of the Supreme Court, such as to afford the plaintiff in error the protection of the commerce clause of the federal constitution.

Commerce among the states has been defined in many cases in the United States Supreme Court, beginning with the leading case of *Gibbons* v. *Odgen,* 9 *Wheat.* 1. In that case Chief Justice Marshall defined this phrase as follows:

"Commerce undoubtedly is traffic, but it is something more; it is intercourse. * * * It has, we believe, been universally admitted that these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other to which this power does not extend."

In *Mobile County* v. *Kimball,* 102 *U. S.* 691, 702, interstate commerce was said to consist "in intercourse and traffic including in these terms navigation and the transportation and transit of persons and property *as well as the purchase, sale and exchange of commodities."*

Almost the same language is used in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 *U. S.* 196, 203.

In *Kidd* v. *Pearson,* 128 *U. S.* 1, it is said that buying and selling and the transportation incidental thereto constitutes commerce, and the regulation of commerce, in a constitutional sense, embraces the regulation, at least, of such transportation.

What is intended by the phrase "commerce among the states" is interstate traffic, buying and selling of merchandise, transportation by common carriers of persons or property by land or by water from one state to another, and the use of navigable waters throughout the United States—all is comprehended.

While interstate commerce necessarily involves interstate transportation, the converse is not always true.

A railroad or ferry company, for example, which transports persons or property from one state to another is undoubtedly engaged in interstate commerce, and a tax by the state upon owners of vessels or common carriers so transporting persons or property has been held void as a regulation of commerce.

Passenger cases: *Smith* v. *Turner, Norris* v. *Boston,* 7 *How.* 283; *Pickard* v. *Pullman Sleeping Car Co.,* 117 *U. S.* 34.

On the other hand, interstate transportation may be conducted without constituting commerce or traffic, which has been defined to be the exchange of merchandise between indi-

viduals, communities or countries, whether direct in the form of barter, or by the use of money or other medium of exchange.

A manufacturer who sends his goods manufactured in Connecticut to his own *entrepot* or store in New York City transports the products from one state to another, but the transportation by such owner is not, of itself, so far as the owner is concerned, interstate commerce in the sense that the city of New York has no power to tax the goods thus stored and awaiting sale in New York, although the merchandise may be intended for a foreign market. The transaction lacks the essential element of trade, namely, sale or exchange. *American Steel and Wire Co.* v. *Speed; 192 U. S.* 500.

In accordance with these principles, it is clear that the transportation of the coal in question by the prosecutor from the mines to the storage plant was simply an act of dominion exercised over the property by its owner, and although the intention was that the coal should be ultimately sold and thereafter exported to other states, it cannot be justly said that there was, by that operation, any traffic in the coal or any business of selling or consignment, or that the transportation was incidental to any existing contract of sale or consignment.

To obtain the protection of the commerce clause of the federal constitution, there must be a continuous movement of the merchandise from one state to another in the actual course of delivery, but if that movement is interrupted by natural causes beyond the control of the shipper, a temporary halting will not subject the property to local taxation.

The leading case on this subject is *Coe* v. *Errol,* 116 *U. S.* 517, in which it appeared that certain logs, cut in New Hampshire, were drawn down the Clear Stream river to the town of Errol, New Hampshire, and there held over the winter, whence it was intended to export them to the State of Maine. Being thus located in the town of Errol, they were taxed by the assessors.

The United States Supreme Court held that the logs were taxable within the State of New Hampshire.

In the Coe case the United States Supreme Court laid down this foundation principle, that although the goods had begun a journey which was intended at some time to result in an interstate commerce transaction, nevertheless, when they came to rest for an indefinite time, awaiting transportation at an intermediate point, they were the subject of taxation.

In *American Steel and Wire Co.* v. *Speed, supra,* it was held that goods transported from one state to another were subject to state taxation after they had reached their destination and whilst held in the state for sale.

In that case a merchants' tax was legally imposed upon a non-resident manufacturing corporation, which selected Memphis, Tennessee, as a distributing point for its product and secured a transfer company to take charge of the goods when shipped to that point, assort them, store them in warehouses and make deliveries in original packages to the customers. It was further held that the goods, when thus stored in the warehouses, were no longer in transit, but had reached their destination and were held in the state for sale.

The Supreme Court declared that the court of Tennessee was right in deciding that the goods were not in transit but had reached their destination at Memphis, and were there held in store at the risk of the steel company, to be sold and delivered as contracts for that purpose were completely consummated.

This case was decided upon the principle that, upon the arrival of the goods at the place of deposit or storage, the movement of transportation ceased, the goods became located in and mingled with the mass of property within the state, and hence subject to local taxation.

In the case of coal transported from Pennsylvania to points on the Mississippi river, and there held for sale and disposition by its owner, the United States Supreme Court in two important cases has held that it was subject to local taxation, having reached a destination for the purpose of sale.

In the first of these cases (*Brown* v. *Houston,* 114 *U. S.* 622) a petition was filed by the plaintiff to restrain the collection of local taxes upon certain coal which was mined in

Pennsylvania and exported from that state and imported into the State of Louisiana, and was afloat on the Mississippi river on flat-boats and in the hands of the plaintiff's agents for sale.

The court held that the coal in question was not protected by the commerce clause of the constitution. Upon the latter subject the court said:

"It was not a tax imposed upon the coal as a foreign product, or as the product of another state than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a state of transit through that state to some other place of destination. It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans. It might continue in that condition for a year or two years, or only for a day. It had become a part of the general mass of property in the state, and as such it was taxed for the current year (1880), as all other property in the city of New Orleans was taxed."

In the later case of *Pittsburg and Southern Coal Co.* v. *Bates,* 156 *U. S.* 577, it appeared that the coal company was engaged in transporting coal from Pittsburg in barges and other vessels for sale at various points on the Mississippi river, and that it was convenient, advantageous or necessary that the vessels should be moored at different landings on the river in several states, pending arrangements for the reception and disposition of the coal.

The company had sent a large number of vessels, about one hundred in number, to supply the trade of Louisiana along the Mississippi and its navigable tributaries. By direction of the plaintiff's agent, to whom the commodity was consigned, the vessels were stopped and moored about nine miles above Baton Rouge, where they awaited the orders of such agent, to be thence navigated to other places deemed convenient or advantageous to the trade, the coal at all times being the property of the company.

An assessment was made by the collector of East Baton Rouge upon the coal thus moored and the coal company ap-

plied for an injunction in a suit to restrain the collection of the tax.

The federal Supreme Court, affirming a judgment dismissing the bill, quoted testimony to the effect that the coal assessed was in the hands of plaintiff's agents for sale, having just arrived from Pittsburg by flat-boats, and was afloat on the Mississippi river; that it was held there to be sold on account of the plaintiff by the boat load, and that since the assessment more than one-half of it had been exported from the country on foreign steamships and the balance sold in the state for plantation use by the flat-boat load. It was also testified that the coal was received in New Orleans in its original condition, and, so to speak, its original packages, and was still owned by the plaintiff.

The court reiterated and adopted the principles laid down in Brown v. Houston, supra, and declared that authority controlling.

The court concluded its opinion in these words:

"The property in this case, as in that, still belongs to the original owners in Pennsylvania, but is brought on the navigable waters of the United States in boats and barges to Louisiana for the purposes of sale, and is subject to taxation and sale as any other property of the citizens of the United States is subject when it becomes incorporated into the bulk of the property of the country."

In comparing the facts in the two cases, Brown v. Houston and Pittsburg and Southern Coal Co. v. Bates, supra, it appears that in the first the coal had reached its destination at New Orleans and while on the barges was offered for sale; in the latter case, the coal had not reached its final destination, but was moored at East Baton Rouge, there awaiting further navigation, to accommodate the convenience of its owners, the exigencies of trade, or the advantages of a market.

In both cases the coal, although in barges, was held for sale by the barge load and was not contracted for or consigned to any purchaser or dealer.

In one case, its journey of transportation had come to an end, in the other, its journey was interrupted and the com-

modity halted at an intermediate point for convenience of distribution and sale.

So, in *Kelley* v. *Rhoads,* 188 *U. S.* 1, the rule established in *Brown* v. *Houston, supra,* and *Coe* v. *Errol, supra,* was expressed in these words:

"The substance of these cases is that while the property is at rest for an indefinite time, awaiting transportation, or awaiting a sale at its place of destination or at an intermediate point, it is subject to taxation. But if it be actually in transit to another state, it becomes the subject of interstate commerce and is exempt from local taxation."

In *Diamond Match Co.* v. *Village of Ontonagon,* 188 *U. S.* 82, the Supreme Court again discussed the subject of interstate commerce, referring to the previous decisions of the court, and said:

"The cases establish that there may be an interior movement of property which does not constitute interstate commerce, though property come from or be destined to another state. In the one case, though it have not reached its place of disembarkation or delivery, it may be taxed. *Brown* v. *Houston, supra.* In the other case, until it be shipped or started on its final journey, it may be taxed. *Coe* v. *Errol, supra.*"

The court finally disposed of the transit theory in these words:

"The appellant's contention is that the movement of the logs commenced at the opening of navigation, presumably in the spring or summer of 1896 and 1897, and from that date (down to 1899 when the tax was laid) were in continuous transit as subjects of interstate commerce and exempt from taxation. The contention is more extreme than that made and rejected in *Coe v.* Errol."

In *Delaware, Lackawanna and Western Railroad Co.* v. *Pennsylvania,* 198 *U. S.* 341, the question arose as to the propriety of including in the appraisement of the capital stock of plaintiff, by the State of Pennsylvania, certain coal stored at Buffalo, New York and Chicago, for the purposes of sale.

The state declined to deduct from the appraisement the value of the coal thus stored.

Upon appeal the United States Supreme Court held that the coal was not subject to taxation in the State of Pennsylvania, having passed beyond its jurisdiction never to return, and used this language:

"In the case at bar the coal had been transported to and was actually resting in another state for sale when the appraisement was made, and under the foregoing cases [referring to *Brown* v. *Houston* and *Coe* v. *Errol, supra*], it was then intermingled with property in the foreign state where it rested, and was, at that time, liable to taxation therein."

It was, in substance, decided in that case that the coal had lost its *situs* in Pennsylvania by being transported from that state to foreign states for the purposes of sale, and when actually resting in the foreign state, and not actually sold, it acquired a *situs* and became a proper subject for taxation for both state and local purposes.

Two Supreme Court cases in New Jersey cited by the appellant demand discussion not only on account of the learning and high character of the justice who wrote the opinions in both cases, but by reason of the apparent confidence of counsel in these authorities as precedents.

These cases are clearly distinguishable from the case at bar, the basic facts in each being quite a variance with the facts here.

In *State* v. *Engle*, 5 *Vroom* 425, it appeared that the German Pennsylvania Coal Company shipped its product from its mines in Pennsylvania across the State of New Jersey to tidewater at Elizabethport, from which point it was shipped in vessels to purchasers in other states. In changing from navigation by rail to water the coal was deposited on the dock at Elizabethport, and shipped by water as soon as a vessel could be chartered to carry it. The coal on the dock ready for shipment was assessed. In that case Justice Depue said:

"The power of the state to tax the subjects of commerce, where their transit for the purposes of commerce has ceased,

and they have become incorporated and mixed up with the mass of property in the community, is well settled."

This is quite in accord with our holding here.

Our Supreme Court in the Engle case found that the coal was in transit; that it was delayed within this state, not for the purpose of storage or sale, but merely for the convenience of shipment to its destination; and, finally, that the coal, when it left the mines, was generally shipped pursuant to a contract for sale and delivery to customers in other states—all distinguishing facts.

In *State, Lehigh and Wilkes-Barre Coal Co., prosecutors,* v. *Carrigan, Collector,* 10 *Vroom* 35, the opinion is by the same justice. The Supreme Court found that before the coal was sent from the mines it was contracted for to be delivered on board vessels at Port Johnson; that it remained on the dock no longer than was necessary to obtain the vessels to transport it, and that "the tax, in fact, was laid upon property in the course of transit across the state." Here the finding is directly to the contrary.

The doctrine of the Engle and Carrigan cases is not in conflict with the principle upon which we decide this case.

It may be that the Lehigh and Wilkes-Barre Coal Company thought to bring its operations within the protection of the Carrigan case, *supra,* to which case it was a party. If so it failed, and the present transaction comes within the rule of *American Steel and Wire Co.* v. *Speed, supra.*

It is claimed by the plaintiff in error that there is no difference (except in distance) between depositing the coal at Hampton Junction and depositing it on the dock.

This depends upon the nature, character and purpose of deposit. If deposited at tidewater in the course of transit across the state, for the purpose of assortment, filling existing contracts and of shipments as soon as boats are provided, it may properly be held to be protected by the commerce clause of the constitution, but if deposited at tidewater or at Junction or anywhere else in the state to await orders for future delivery, for the purpose of future disposition and sale, for

the purpose of keeping a stock on hand to supply customers when mines are closed, or to accumulate a supply to meet demands which the mines are not competent to fill at normal rates of production, we think the coal deposited has become intermingled with the mass of general property within the state and subject to taxation.

The fact is clear that the purpose of the storage plant was more to control the output for the convenience of the coal company, in economical disposition of its product, than to facilitate its transportation to another state.

Chief Justice Marshall, in *Brown* v. *Maryland*, 12 *Wheat.* 419, 441, in discussing the power of the state to tax persons and property, as affected by the constitutional prohibition against taxing imports, said that "the power and the restriction on it, though quite distinguishable, when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision, in marking the distinction between them. Yet the distinction exists and must be marked as the cases arise."

Referring to taxes on imports, he laid down the test as follows:

"When the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import and has become subject to the taxing power of the state."

Upon both principle and authority we find no difficulty in reaching the conclusion that under the facts in this case the coal company surrendered, if, indeed, it had ever grasped, the shield of the federal constitution, and the coal, taken out of the vehicle of transportation, or, by analogy, out of its original package, and mingled with other movable property, acquired a *situs,* and thus became subject to the taxing power of this state.

The decision of the Supreme Court is accordingly affirmed, and the tax sustained.

*For affirmance*—THE CHIEF JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, BERGEN, BOGERT, VROOM, GREEN, GRAY, DILL, J.J.   11.

*For reversal*—None.