## THE ROSEMARY.

### UNITED STATES v. SOUND MOTOR BOAT SERVICE, Inc.

Circuit Court of Appeals, Third Circuit.
April 30, 1928.

No. 3766.

Admiralty &#x25CE;&#x21C0;32—Federal District Court of New Jersey has jurisdiction of forfeiture proceeding against vessel seized violating federal laws on Jersey side of Hudson river (Rev. St. § 563 [see 28 USCA § 41, subd. 9]; Act June 28, 1834 [4 Stat. 708]).

Jurisdiction of forfeiture proceeding against a vessel for violating a law of the United States, which under Rev. St. § 563 (see 28 USCA § 41[9]) is in a Federal District Court, is in the district of New Jersey, the vessel having been seized during such violation on the New Jersey side of the middle of the Hudson river; treaty between New York and New Jersey, ratified by Congress by Act June 28, 1834 (4 Stat. 708), not changing the boundary between the states, but merely giving the state of New York exclusive jurisdiction for exercise of the police power over such waters and the lands covered thereby, and not affecting federal jurisdiction.

Appeal from District Court of the United States for the District of New Jersey; Wm. N. Runyon, Judge.

Forfeiture proceeding by the United States against the motorboat Rosemary; the Sound Motor Boat Service, Inc., owner and claimant. Libel dismissed (23 F.[2d] 103), and the United States appeals. Reversed and remanded.

Walter G. Winne, U. S. Atty., of Hackensack, N. J., Douglas M. Hicks, Asst. U. S. Atty., of New Brunswick, N. J., and Arthur W. Henderson, of Washington, D. C., for the United States.

Louis Halle, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case involves the question, what territory is embraced in the state, and consequently in the district, of New Jersey? The answer to that question rests on certain basic facts: First, by the act of Congress of 1789 (incorporated into section 96 of the Judicial Code [28 USCA § 176]), it was provided "the state of New Jersey shall constitute one judicial district to be known as the district of New Jersey," of which act the Supreme Court in Re Devoe Mfg. Co., 108 U. S. 401, 2 S. Ct. 894, 27 L. Ed. 764, said: "We are all of the opinion that, when the act of Congress of 1789 declared that the New Jersey district should consist of the state of New Jersey, it intended that any territory, land or water, which should at any time, with the express assent of Congress, form part of that state should form part of the district of New Jersey." Second, by R. S. § 563, "the District Courts shall have jurisdiction as follows: First. Of all crimes and offenses cognizable under the authority of the United States, committed within their respective districts. * * * [See 28 USCA § 41 (2)]. Third. Of all suits for penalties and forfeitures incurred under any law of the United States. * * * [See 28 USCA § 41 (9)]. Eighth. Of all civil causes of admiralty and maritime jurisdiction. [See 28 USCA § 41 (3)]." Third, at the date of these statutes, the state of New Jersey claimed ownership to the middle of the Hudson river of the land underlying that river, and consequently by the foregoing acts the District Court of New Jersey had maritime jurisdiction of the waters thus covering the territorial boundary of the state to the middle of the stream. Fourth, the Rosemary, the vessel here involved in a forfeiture proceeding, was seized by the customs authorities of the United States while violating a law of the United States in and on waters covering land within the territorial limits of New Jersey, and therefore within the jurisdiction of the District Court of New Jersey, and, unless in some way that court was deprived of its original jurisdiction, such jurisdiction still obtains. Fifth, it is now contended, and the court below so held, that the jurisdiction thus conferred by acts of Congress upon the District Court of New Jersey was taken away from it by a treaty made between New York and New Jersey in 1834.

We assume that, where states by consent of Congress change or define their territorial boundary lines, the boundaries of abutting federal districts and their territorial jurisdiction will adjust themselves thereto and be coterminous with the territorial boundaries of the state as so fixed by them. It follows, therefore, if this treaty makes a territorial limit and a sovereignty ownership of the state of New Jersey which does not cover the locus in quo of this seizure, the court below rightly held the District Court of New Jersey had no jurisdiction to decree forfeiture

because the seizure was not made in the state and therefore not the District of New Jersey.

The surrender by New Jersey of its boundary as claimed from the Revolution is alleged by the claimants of the Rosemary to have been made in 1834, by an act of that state entitled "An act to ratify and confirm an agreement made between the commissioners appointed by the Governor of the state of New York, and the commissioners appointed by the Governor of the state of New Jersey, respecting the territorial limits and jurisdiction between the said states." Laws 1833–34, p. 118. It will be noted that not only does the act state, and thus differentiate, two distinct, separate subjects of settlement, viz. "the territorial limits" and "jurisdiction between the said states," but the courts of New Jersey have so construed the statute and treaty, and the Supreme Court of the United States has thereto agreed also, in Cook v. Weigley, 72 N. J. Eq. 221, 65 A. 196, where it is said:

"Article 1, in clear and explicit language, fixed the boundary line between the states as the middle of the Hudson river and the bay of New York. This disposed of the question of territorial limits, and had this been the only matter submitted to the commissioners would have exhausted their authority in the premises. They were, however, empowered to deal also with jurisdiction. * * * By article 2 of the treaty the lands in question are declared to be within the boundary of the state of New Jersey, and subject to the sovereignty of that state, encumbered, however, with the right of New York to exercise jurisdiction over it. This, in my opinion, does not change the territorial location of the land, for the reservation of jurisdiction thereover did not have the effect of retaining the land as a part of the territory of the state of New York, and the jurisdiction which the state of New York retained, and may exercise, is no greater than the 'exclusive jurisdiction' granted to New York over all the waters of the bay of New York, and does not have the effect, here contended for, of depriving this court of the jurisdiction necessary to determine the legal status of these islands to the same extent that it may do with regard to all other lands within its boundaries."

To the same effect is Central R. R. v. Jersey City, 70 N. J. Law, 92, 56 A. 243, where it is said:

"In the enactments themselves the same duality of objects to be settled is at all times observed in the statutes in each state. In plain terms, therefore, the commissioners were empowered to negotiate respecting two things, and thereby to settle two things, namely, limits of territory and jurisdiction. Nowhere is there any intimation that those two were deemed to be one and the same thing. * * * From these considerations, the conclusions reached are that the agreement of 1834 between the commissioners representing the states of New Jersey and New York, having been confirmed by their respective Legislatures and approved by the Congress of the United States, established the boundary line between this state and the state of New York in the middle of the Hudson river and of the bay of New York, and that the sovereignty of the state of New Jersey is coextensive with the territorial limits thus established, subject only to such extraterritorial jurisdiction of a juridical character as was by the said compact conceded to the state of New York, from which it results that the sovereign power of taxation over all the territory thus defined resides in the state of New Jersey."

The case was affirmed in 72 N. J. Law, 311, 61 A. 1118, and on review by the Supreme Court of the United States it was said in 209 U. S. 473, 28 S. Ct. 592, 52 L. Ed. 896:

"It is said that a different meaning does appear in the article (3) that gives New York exclusive jurisdiction over this land as well as the water above it. But we agree with the state courts that have been called on to construe that part of the agreement that the purpose was to promote the interests of commerce and navigation, not to take back the sovereignty that otherwise was the consequence of article I. This is the view of the New York as well as of the New Jersey Court of Errors and Appeals, and it would be a strange result if this court should be driven to a different conclusion from that reached by both the parties concerned. Ferguson v. Ross, 126 N. Y. 459, 463 [27 N. E. 954]; People v. Central R. R. Co., 42 N. Y. 283. This opinion is confirmed by the judgment delivered by one of the commissioners in State v. Babcock, 1 Vroom [30 N. J. Law] 29. Again, as was pointed out by the state court, the often expressed purpose of the appointment of the commissioner and of the agreement to settle the territorial limits and jurisdiction must mean by territorial limits sovereignty, and by jurisdiction something less."

Now as by the Constitution Congress was given power to "make rules concerning captures on land and water" (Const. art. 1, §

8, cl. 11) and as "the judicial power shall extend * * * to all cases of admiralty and maritime jurisdiction" (Const. art. 3, § 2), it will be seen that forfeitures of vessels are within the exclusive jurisdiction of the federal courts. It follows, therefore, when the states of New Jersey and New York provided for the apportionment of their several jurisdictions, that this referred to state jurisdiction which they could affect and not matters of federal jurisdiction, of which they had no control. And that this was all the treaty did, and that there was no purpose to affect or surrender existing federal jurisdiction, is conclusively shown by the fact that the ratifying act of Congress of June 28, 1834 (4 Stat. 708), provided that nothing contained in the states' agreement "shall be construed to impair or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement." It is contended, however, that while the boundary of New Jersey extended over submerged land to the center of the Hudson and to all exercise of sovereignty in relation to such submerged land, that vessels on the water covering such lands were not within the state of New Jersey. The contrary of this was decided in Tennant v. State Board of Taxes and Assessments, 95 N. J. Law, 469, 113 A. 254, where it was said:

"But this jurisdiction has been held by the courts of both New York and New Jersey to be a jurisdiction simply for the exercise of the police power. People v. Central Railroad of New Jersey, 42 N. Y. 283; Central Railroad Co. v. Jersey City, 70 N. J. Law, 81 [56 A. 239]; S. C., 209 U. S. 473 [28 S. Ct. 592, 52 L. Ed. 896]. In the opinion of Mr. Justice Garrison, in 70 N. J. Law, at page 97 [56 A. 245], it is declared that 'the sovereign power of taxation over all the territory thus defined (i. e., to the middle of the Hudson river) resides in the State of New Jersey.' See Cook v. Weigley, 72 N. J. Eq. 221 [65 A. 196]. A vessel more or less permanently moored within the territory is, in our opinion, personal property 'found' within the taxing district, in the same manner as, e. g., coal on storage pending a sale and removal. Lehigh & Wilkes-Barre Coal Co. v. Junction, 75 N. J. Law, 922 [68

A. 806, 15 L. R. A. (N. S.) 514]. It is pertinent to note, while on this subject, that the libels against this tug were filed in the United States District Court for the District of New Jersey, and the seizure was made by the marshal of that court, in conformity, as it seems to us, with the statutory provision that 'the state of New Jersey shall constitute one judicial district' (Rev. Stat. U. S. § 531; Comp. Stat. U. S. 1913, § 1082 [28 USCA § 176]), treated as meaning that the district extends to the middle of the river, for all purposes of executing civil process out of that court."

We are not unmindful that there is a conflict of decision on this subject in the earlier decisions of the District Courts of New York and those of New Jersey, but we feel the weight of reasoning, the acquiescence of the two states, and the trend of later judicial decision unite in vindicating the assertion of jurisdiction exercised by Judge Nixon of the District Court over the water in question forty years ago in The Kennedy, 25 F. 571. There a schooner was seized under process of that court when afloat and at anchor on the westerly side of the center line of the Hudson river, and Judge Nixon rightfully upheld the jurisdiction of the District Court in these words:

"No authority is found in any act of Congress for the courts of the district in one state to exercise jurisdiction over the territory of another. * * * Whatever may be the arrangements between the states as to police regulations and quarantine laws, they cannot be construed into a surrender of the admiralty jurisdiction of the courts of the United States throughout the state. It was probably, in part at least, to prevent any such construction of the compact, that the Congress, in its act assenting to the same, added another section to said act of ratification, providing that nothing therein contained should be construed to impair, or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which formed the subject of the agreement."

The decree below is therefore reversed, and the record remanded, with instructions to reinstate the case and proceed in due course.