BROWN & Another *v.* HOUSTON, Collector, & Another.

IN ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

Argued April 3, 1884.—Decided May 4, 1885.

The terms "imports" and "exports" in Art. 1, Sec. 10, Clause 2, of the Constitution, prohibiting States, without the consent of Congress, from levying duties on imports or exports, has reference to goods brought from, or carried to foreign countries alone, and not to goods transported from one State to another.

*Woodruff* v. *Parham*, 8 Wall. 123, affirmed and applied.

A general State tax, laid alike upon all property, does not infringe that clause of the Constitution if it happens to fall upon goods which, though not then intended for exportation, are subsequently exported.

Article 1, Section 8, clause 3 of the Constitution, which confers upon Congress the power to regulate commerce among the several States, leaves to the States in the absence of Congressional legislation, the power to regulate matters of local interest, which affect inter-State commerce only incidentally; but the power of Congress over inter-State commerce is exclusive wherever

Opinion of the Court.

the matter is national in character, or admits of a uniform system or plan of regulation.

So long as Congress passes no law to regulate inter-State commerce of the nature and character which makes its jurisdiction exclusive, its refraining from action indicates its will that that commerce shall be free and untrammelled.

Coal mined in Pennsylvania and sent by water to New Orleans to be sold in open market there on account of the owners in Pennsylvania, becomes intermingled, on arrival there, with the general property in the State of Louisiana, and is subject to taxation under general laws of that State, although it may be, after arrival, sold from the vessel on which the transportation was made, and without being landed, and for the purpose of being taken out of the country on a vessel bound to a foreign port.

Such taxation does no violation either to Art 1, Sec. 8, Clause 3 ; Art. 1, Sec. 10, Clause 2 ; or Art. 4, Sec. 2, Clause 1 of the Constitution.

The proper limits of these rulings pointed out.

This was a suit in the nature of a bill in equity to restrain the defendants, who were defendants in error here, from collecting a tax, imposed upon personal property by the authorities of the State of Louisiana. The facts which make the case are stated in the opinion of the court.

*Mr. Charles W. Hornor* for plaintiffs in error.

No argument or brief for defendants in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This suit was brought by the plaintiffs in error in the Civil District Court for the Parish of Orleans, State of Louisiana, 30th December, 1880, to enjoin the defendant, Houston, from seizing and selling a certain lot of coal belonging to the plaintiffs, situated in New Orleans. They alleged in their petition that they were residents and did business in Pittsburg, State of Pennsylvania; that Houston, State tax collector of the upper district of the Parish of Orleans, had officially notified Brown & Jones, the agents of the plaintiffs in New Orleans, that they (Brown & Jones) were indebted to the State of Louisiana in the sum of $352.80, State tax for the year 1880 upon a certain lot of Pittsburg coal, assessed as their property, and valued at $58,800; that they (Brown & Jones) were delinquents for said tax, and that he, said tax collector, was about to seize, advertise and sell said coal to pay said tax, as would appear by a copy

of the notice annexed to the petition. The plaintiffs alleged that they were not indebted to the State of Louisiana for said tax; that they were the sole owners of the coal, and were not liable for any tax thereon, having paid all taxes legally due for the year 1880 on said coal in Pennsylvania; and that the said coal was simply under the care of Brown & Jones as the agents of the plaintiffs in New Orleans, for sale. They further alleged that said coal was mined in Pennsylvania, and was exported from said State and imported into the State of Louisiana as their property, and was then (at the time of the petition), and had always remained, in its original condition, and never had been or become mixed or incorporated with other property in the State of Louisiana. That when said assessment was made, the said coal was afloat in the Mississippi River in the parish of Orleans, in the original condition in which it was exported from Pennsylvania, and the agents, Brown & Jones, notified the board of assessors of the parish that the coal did not belong to them, but to the plaintiffs, and was held as before stated, and was not subject to taxation, and protested against the assessment for that purpose. The plaintiffs averred that the assessment of the tax and any attempt to collect the same were illegal and oppressive, and contrary to the Constitution of the United States, Article 1, section 8, paragraphs 1 and 3, and section 10, paragraph 2; they therefore prayed an injunction to prevent the seizure and sale of the coal, which, upon giving the requisite bond, was granted.

The notice of assessment referred to in the petition and annexed thereto, was as follows:

"OFFICE STATE TAX COLLECTOR, UPPER DISTRICT
PARISH OF ORLEANS, No. 24 UNION STREET,
NEW ORLEANS, *Dec.* 20, 1880.

To BROWN & JONES, *Gravier and Charles Street.*

SIR: You are hereby officially notified, in conformity with the provisions of Act No. 77 of 1880, that the State taxes assessed to you on movable property in this parish, which amount to the sum of $352.80 (the aggregate assessed value of such property being $58,800.00), fell due and should have been paid

in full on or before the first day of the current month; that you became a delinquent for said taxes on such first day of December; that after the expiration of twenty days from the date of this notice, I, as tax-collector of the upper district of the parish of Orleans, will advertise for sale the movable property on which the said taxes are due in the manner provided by law for judicial sales; that at the principal front door of the court-house, where the Civil District Court of said parish is held, I will sell within the legal hours for judicial sales, for cash and without appraisement, such portion of the said movable property as you shall point out and deliver to me, and in case you shall not point out sufficient property that I will at once and without further delay sell for cash without appraisement the least quantity of said movable property which any bidder will buy for the amount of taxes assessed upon movable property, with interest and costs.

Respectfully yours,

J. D. HOUSTON,

*State Tax-Collector, Upper District Parish of Orleans.*"

The defendant answered with a general denial, but admitting the assessment of the tax and the intention to sell the property for payment thereof.

The plaintiffs, to sustain the allegations of their petition, produced two witnesses. George F. Rootes testified that he was the general agent and manager of the business of Brown & Jones in New Orleans; that when the assessment complained of was made, the firm had paid the State taxes due upon their capital stock, and had paid State and city licenses to do business for that year; that, at the time of the assessment of the tax in question, the coal upon which it was levied was in the hands of Brown & Jones, as agents for the plaintiffs, for sale, having just arrived from Pittsburg, Pennsylvania, by flat-boats, and was on said boats in which it arrived and afloat in the Mississippi River; that it was held by Brown & Jones to be sold for account of the plaintiffs by the boat load, and that since then more than half of it had been exported from this country on foreign steamships and the balance sold into the

interior of the State for plantation use by the flat-boat load. Samuel S. Brown, one of the plaintiffs, testified that the plaintiffs were the owners of the coal in question; that it was mined in plaintiffs' mine in Allegheny County, Pennsylvania; that a tax of two or more mills was paid on it in Pennsylvania as State tax thereon, in the year 1880, being the tax of 1880; that a tax was also paid on it to the County of Allegheny for the year 1880; that it was shipped from Pittsburg, Pennsylvania, in 1880, and was received in New Orleans in its original condition and in its original packages, and still owned by the plaintiffs. No other proof was offered in the case.

The Louisiana statute of April 9, 1880, Act No. 77, under which the assessment was made, provided as follows:

"Section 1st. That for the calendar year 1880, and for each and every succeeding calendar year, there are hereby levied annual taxes, amounting in the aggregate to six mills on the dollar of the assessed valuation hereafter to be made of all property situated within the State of Louisiana, except such as is expressly exempted from taxation by the (State) Constitution."

The exemptions from taxation under the Constitution of Louisiana do not affect the question.

Upon the case as thus made the District Court of the parish dissolved the injunction and dismissed the suit. On appeal to the Supreme Court of Louisiana, this judgment was affirmed, and the case is now here by writ of error to the judgment of the Supreme Court.

The following errors have been assigned:

"The lower court erred in holding:

"1st. That the tax in question did not violate Article 4, section 2, clause 1, of the Federal Constitution.

"2d. That it did not violate Article 1, section 8, clause 3, of the same instrument.

"3d. That it did not violate Article 1, section 10, clause 2, of the same instrument."

The clauses here referred to are these:

1. "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

2. "The Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

3. "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

The constitutional questions here presented were argued in the Supreme Court of Louisiana, and in what manner the subject was viewed by that court may be seen by the following extracts from its opinion, *Brown.* v. *Houston*, 33 La. Ann. 843, filed as part of the judgment. The court said:

"*First.* This act [Act No. 77 of 1880] does not in its terms discriminate against the products of other States or the property of the citizens of other States, but subjects all property liable to taxation found within the State, whether of its own citizens or citizens of other States, whether imported from other. States or produced here, to the same rate of taxation. . . .

"*Second.* The coal in question was taxed in common with all other property found within the State. We held in the case of *City of New Orleans* v. *Eclipse Towboat Co.*, recently decided by us, but not reported,*,that the clause in the Federal Constitution giving to Congress the power to regulate commerce with foreign nations and among the States had no immediate relation to or necessary connection with the taxing power of a State. Every tax upon property, it is true, may affect more or less the operations of commerce, by diminishing the profits to be derived from the subjects of commerce, but it does not for that reason amount to a regulation of commerce within the meaning of the Federal Constitution, and such is the doctrine laid down by the Supreme Court of the United States. *State Tax on Railway Gross Receipts*, 15 Wall. 284, at page 293. . . .

"*Third.* This tax cannot be regarded as a duty or impost levied by the State on imports. To give such a construction

---

* *Note by the Court.*—The judgment in this case was reversed by this court in *Moran* v. *New Orleans,* 112 U. S. 69, 75.

to it, and to recognize the alleged prohibition contended for, would create an exemption for all goods and merchandise and property of every kind and description brought into the State for sale or use, and by such construction destroy a main source of revenue to the State. As we had occasion to show in the case referred to, the word ' imports ' used in the Constitution has been construed to apply not to property brought or imported from other States of the Union, but solely to imports from foreign countries. *Woodruff* v. *Parham*, 8 Wall. 123; *Pervear* v. *Commonwealth*, 5 Wall. 475, 479. . . ."

In approaching the consideration of the case we will first take up the last objection raised by the plaintiff in error, namely, that the tax was a duty on imports and exports.

It was decided by this court in the case of *Woodruff* v. *Parham*, 8 Wall. 123, that the term "imports" as used in that clause of the Constitution which declares that " no State shall, without the consent of Congress, lay any imposts or duties on imports or exports," does not refer to articles carried from one State into another, but only to articles imported from foreign countries into the United States. In that case the City of Mobile had by ordinance, passed in pursuance of its charter, authorized the collection of a tax on real and personal estate, sales at auction, and sales of merchandise, capital employed in business and income within the city. Woodruff and others were auctioneers, and were taxed under this ordinance for sales at auction made by them, including sales of goods, the product of other States than Alabama, received by them as consignees and agents, and sold in the original and unbroken packages; but as the ordinance made no discrimination between sales at auction of goods produced in Alabama and goods produced in other States, the court held that the tax was not unconstitutional. A contrary result must have been reached under the ruling in *Brown* v. *Maryland*, 12 Wheat. 419, if the constitutional prohibition referred to had been held to include imports from other States as well as imports from foreign countries; for, at the time the tax was laid, the condition of the goods, in reference to their introduction into the State, was precisely the same in one case as in the other. This

court, however, after an elaborate examination of the question, held that the terms "imports" and "exports" in the clause under consideration had reference to goods brought from or carried to foreign countries alone, and not to goods transported from one State to another.

It is unnecessary, therefore, to consider further the question raised by the plaintiffs in error under their third assignment of errors so far forth, as it is based on the assumption that the tax complained of was an impost or duty on imports. The other assumption made under that assignment, that some of the coal was afterwards exported, and that the tax complained of was therefore *pro tanto* a duty on exports, is equally untenable. When the petition was filed the.coal was lying in New Orleans, in the hands of Brown & Jones, for sale. . The petition states this in so many words, and Rootes testifies the same thing, and adds that it was to be sold by the flat-boat load. ·He also adds that at the time of his examination more than half of it had been exported to foreign countries; but he probably means that it had been sold to steamers sailing to foreign ports for use on the same, and had only been exported in that way. The complainants were not exporters; they did not hold the coal at New Orleans for exportation, but for sale there. Being in New Orleans, and held there on sale, without reference to the destination or use which the purchasers might wish to make of · it, it was taxed in the hands of the owners (or their agents) like all other property in the city, six mills on the dollar. If after this, and after being sold, the purchaser thought proper to put it on board of a steamer bound to foreign parts, that did not alter the character of the taxation so as to convert it from a general tax to a duty on exports. When taxed it was not held with the intent or for the purpose of exportation, but with the intent and for the purpose of sale there, in New Orleans. A duty on exports must either be a duty levied on goods as a condition, or by reason of their exportation, or, at least, a direct tax or duty on goods which are intended for exportation. Whether the last would be a duty on exports, it is not necessary to determine. But certainly, where a general tax is laid on all property alike,.

it cannot be construed as a duty on exports when falling upon goods not then intended for exportation, though they should happen to be exported afterwards. This is the most that can be said of the goods in question, and we are therefore of opinion that the tax was not a duty on exports any more than it was a duty on imports, within the meaning of those terms in the clause under consideration.

But in holding, with the decision in *Woodruff* v. *Parham*, that goods carried from one State to another are not imports or exports within the meaning of the clause which prohibits a State from laying any impost or duty on imports or exports, we do not mean to be understood as holding that a State may levy import or export duties on goods imported from or exported to another State. We only mean to say that the clause in question does not prohibit it. Whether the laying of such duties by a State would not violate some other provision of the Constitution, that, for example, which gives to Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes, is a different question. This brings us to the consideration of the second assignment of error, which is founded on the clause referred to.

The power to regulate commerce among the several States is granted to Congress in terms as absolute as is the power to regulate commerce with foreign nations. If not in all respects an exclusive power; if, in the absence of Congressional action, the States may continue to regulate matters of local interest only incidentally affecting foreign and inter-State commerce, such as pilots, wharves, harbors, roads, bridges, tolls, freights, etc., still, according to the rule laid down in *Cooley* v. *Board of Wardens of Philadelphia*, 12 How. 299, 319, the power of Congress is exclusive wherever the matter is national in its character or admits of one uniform system or plan of regulation; and is certainly so far exclusive that no State has power to make any law or regulation which will affect the free and unrestrained intercourse and trade between the States, as Congress has left it, or which will impose any discriminating burden or tax upon the citizens or products of other States, coming or brought within its jurisdiction. All laws and regulations are restrictive

of natural freedom to some extent, and where no regulation is imposed by the government which has the exclusive power to regulate, it is an indication of its will that the matter shall be left free. So long as Congress does not pass any law to regulate commerce among the several States, it thereby indicates its will that that commerce shall be free and untrammelled; and any regulation of the subject by the States is repugnant to such freedom. This has frequently been laid down as law in the judgments of this court. In *Welton* v. *State of Missouri*, 91 U. S. 282, Mr. Justice Field, speaking for the court, said: "The fact that Congress has not seen fit to prescribe any specific rules to govern inter-State commerce does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that inter-State commerce shall be free and untrammelled." This was said in a case where the plaintiff in error had been convicted of selling goods without a license under a law of the State of Missouri, which prohibited any person from dealing as a peddler without license, and which declared that a peddler was one dealing in goods or wares "not the growth, produce or manufacture of this State, [Missouri] by going from place to place to sell the same." To the same purport, and on the same subject generally, see *Gibbons* v. *Ogden*, 9 Wheat. 1, 209; *License Cases*, 5 How. 504, 575, 592, 594, 600, 605; *Passenger Cases*, 7 How. 282, 407, 414, 419, 445, 462–464; *Crandall* v. *Nevada*, 6 Wall. 35, 41–49; *Paul* v. *Virginia*, 8 Wall. 168, 182–184; *Ward* v. *Maryland*, 12 Wall. 418, 430–431; *State Tax on Railway Receipts*, 15 Wall. 284, 293; *The Lottawanna*, 21 Wall. 558, 581; *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Sherlock* v. *Alling*, 93 U. S. 99; *Railroad Co.* v. *Husen*, 95 U. S. 465; *Cook* v. *Pennsylvania*, 97 U. S. 566; *Guy* v. *Baltimore*, 100 U. S. 434; *Tiernan* v. *Rinker*, 102 U. S. 123; *Packet Co.* v. *Catlettsburg*, 105 U. S. 559; *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 701; and see *Moran* v. *New Orleans*, 112 U. S. 69. In the case of *Railroad Co.* v. *Husen*, 95 U. S. 465, 469, in which another law of the State of Missouri came up for consideration, which declared that no Texas, Mexican or Indian cattle should

be driven, or otherwise conveyed into the State between the 1st of May and the 1st of November, unless carried through the State in cars, without being unloaded, this court through Mr. Justice Strong, said : " It seems hardly necessary to argue at length that, unless the statute can be justified as a legitimate exercise of the police power of the State, it is a usurpation of the power vested exclusively in Congress. It is a plain regulation of inter-State commerce, a regulation extending to prohibition. Whatever may be the power of a State over commerce that is completely internal, it can no more prohibit or regulate that which is inter-State than it can that which is with foreign nations." In short, it may be laid down as the settled doctrine of this court, at this day, that a State can no more regulate or impede commerce among the several States than it can regulate or impede commerce with foreign nations.

This being the recognized law, the question then arises whether the assessment of the tax in question amounted to any interference with, or restriction upon the free introduction of the plaintiffs' coal from the State of Pennsylvania into the State of Louisiana, and the free disposal of the same in commerce in the latter State; in other words, whether the tax amounted to a regulation of, or restriction upon, commerce among the States; or only to an exercise of local administration under the general taxing power, which, though it may incidentally affect the subjects of commerce, is entirely within the power of the State until Congress shall see fit to interfere and make express regulations on the subject.

As to the character and mode of the assessment, little need be added to what has already been said. It was not a tax imposed upon the coal as a foreign product, or as the product of another State than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a state of transit through that State to some other place of destination. It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans. It might

continue in that condition for a year or two years, or only for a day. It had become a part of the general mass of property in the State, and as such it was taxed for the current year (1880), as all other property in the City of New Orleans was taxed. Under the law, it could not be taxed again until the following year. It was subjected to no discrimination in favor of goods which were the product of Louisiana, or goods which were the the property of citizens of Louisiana. It was treated in exactly the same manner as such goods were treated.

It cannot be seriously contended, at least in the absence of any congressional legislation to the contrary, that all goods which are the product of other States are to be free from taxation in the State to which they may be carried for use or sale. Take the City of New York, for example. When the assessor of taxes goes his round, must he omit from his list of taxables all goods which have come into the city from the factories of New England and New Jersey, or from the pastures and grainfields of the West? If he must, what will be left for taxation? And how is he to distinguish between those goods which are taxable and those which are not? With the exception of goods imported from foreign countries, still in the original packages, and goods in transit to some other place, why may he not assess all property alike that may be found in the city, being there for the purpose of remaining there till used or sold, and constituting part of the great mass of its commercial capital—provided always, that the assessment be a general one, and made without discrimination between goods the product of New York, and goods the product of other States? Of course the assessment should be a general one, and not discriminative between goods of different States. The taxing of goods coming from other States, as such, or by reason of their so coming, would be a discriminating tax against them as imports, and would be a regulation of inter-State commerce, inconsistent with that perfect freedom of trade which Congress has seen fit should remain undisturbed. But if, after their arrival within the State,—that being their place of destination for use or trade,—if, after this, they are subjected to a general tax laid alike on all property within the city, we fail to see how such a

taxing can be deemed a regulation of commerce which would have the objectionable effect referred to.

We do not mean to say that if a tax-collector should be stationed at every ferry and railroad depot in the City of New York, charged with the duty of collecting a tax on every wagon load, or car load of produce and merchandise brought into the city, that it would not be a regulation of, and restraint upon inter-State commerce, so far as the tax should be imposed on articles brought from other States. We think it would be, and that it would be an encroachment upon the exclusive powers of Congress. It would be very different from the tax laid on auction sales of all property indiscriminately, as in the case of *Woodruff* v. *Parham*, which had no relation to the movement of goods from one State to another. It would be very different from a tax laid, as in the present case, on property which had reached its destination, and had become part of the general mass of property of the city, and which was only taxed as a part of that general mass in common with all other property in the city, and in precisely the same manner.

When Congress shall see fit to make a regulation on the subject of property transported from one State to another, which may have the effect to give it a temporary exemption from taxation in the State to which it is transported, it will be time enough to consider any conflict that may arise between such regulation and the general taxing laws of the State. In the present case we see no such conflict, either in the law itself or in the proceedings which have been had under it and sustained by the State tribunals, nor any conflict with the general rule that a State cannot pass a law which shall interfere with the unrestricted freedom of commerce between the States.

In our opinion, therefore, the second assignment of error is untenable.

The only remaining assignment of error to be considered is, that the tax in question violated that clause of the Fourth Article of the Constitution which declares that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." As the applicability of this objection did not occur to us upon reading the record of the

case, we have carefully examined the brief of the plaintiffs' counsel for light on the subject, but, so far as we can understand, the point is not urged. We are certainly unable to see how, or in what respect, any equality of privileges as citizens has been denied to the plaintiffs by the imposition of the tax. Their property was only taxed like that of all other persons, whether citizens of Louisiana or of any other State or country. Not the slightest discrimination was made.

The judgment of the Supreme Court of Louisiana is

*Affirmed.*