JOHN T. FAHEY et al.

*vs.*

BALTIMORE AND OHIO RAILROAD COMPANY.

*Carriers—Limitation of Liability—Foreign Commerce—Inter-
state Commerce Act—Cummins Amendment—
Estoppel of Carrier.*

A shipment is to be regarded and classified as foreign com-
merce for the purpose of a statute in reference to a carrier's
liability for loss, if the shipment was started with the intention
of export, and it would have proceeded to a foreign destination
as the normal result of the movement thus originated, regardless
of whether the bill of lading discloses that it was for export.
p. 164

Where grain shipped over defendant's railroad was, at the
time of shipment, and also when it was destroyed in an accident
on the railroad, intended for transportation to a seaport, there
to be unloaded into defendant's elevators and loaded therefrom
into vessels for export to Europe, the bills of lading themselves
disclosed that the shipments were for export, and plaintiffs,
while the grain was in transit, acquired the bills of lading with
the purpose of shipping it abroad, the shipments are to be classi-
fied as foreign commerce. p. 169

That the bills of lading were purchased while the grain was
in transit made no change in its movement or destination or in
any of its commercial characteristics. p. 169

Where merchandise is in course of transportation to Europe
at the time of its destruction in a railroad accident, it is not
within the operation of the amendment to the Interstate Com-
merce Act, which prohibits any contract exempting a carrier
from liability for the full amount of any loss, in the case of a
shipment between states or to an adjacent foreign country, and
a stipulation in the bill of lading restricting damages to the
value of the merchandise at the time of shipment is valid.
p. 169

The carrier is not estopped from asserting a provision in the
bill of lading, which purports to restrict "the amount of any
loss or damage for which any carrier is liable," by reason of the

fact that it delayed for a considerable period to notify the owner of the loss in a railway accident of the grain shipped, during which period the replacement value of the grain greatly increased.                                                    p. 170

*Decided June 28th, 1921.*

Appeal from the Superior Court of Baltimore City (GORTER, J.).

Action by John T. Fahey and others, copartners trading as John T. Fahey & Company, against the Baltimore and Ohio Railroad Company. From a judgment for defendant, plaintiffs appeal. Affirmed.

The so-called "Cummins Amendment" of the Interstate Commerce Act (38 Stat. at L. 1196) provided in effect that any common carrier receiving goods for transportation "from a point in one state or territory or the District of Columbia to a point in another state, territory or the District of Columbia, or from any point in the United States to a point in an adjacent foreign country," should be responsible for the full amount of any damage to or loss of the property, without reference to any attempted limitation of such liability in the bill of lading or elsewhere, and that any such limitation should be unlawful and void. This amendment involved an amplification of the so-called Carmack Amendment (34 Stat. at L. 595).

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*R. E. Lee Marshall,* for the appellants.

*Duncan K. Brent* and *Allen S. Bowie,* for the appellee.

URNER, J., delivered the opinion of the Court.

Eight carloads of grain, purchased by the plaintiffs, were destroyed in accidents while in course of railway conveyance

to Baltimore from points in Nebraska, Michigan, Indiana and Ohio.   The defendant railroad company, on whose line the losses occurred, paid to the plaintiffs the value of the grain at the time and place of shipment.   This was the measure of damages prescribed by the bills of lading under which the grain was being transported, but it did not fully compensate the plaintiffs for the losses actually sustained.   The liability of the carrier could not be thus restricted unless the grain was intended for export to a foreign country not adjacent to the United States.   If it was received for transportation only from one state to another, or was destined for export to an adjacent foreign country, the carrier was prohibited by the Federal Act to Regulate Commerce, and its amendments, from stipulating for recovery of less than the full amount of the actual loss, damage or injury to the property in transit, and the limitation of liability in the bills of lading before us would, under the express terms of that legislation, be null and void.   38 *Stat. at L.,* 1196; *Comp. Stat.,* sec. 8604a; 39 *Stat. at L.* 441.   In this suit to recover for losses in addition to those for which payment was made as provided by the bills of lading, the court below ruled that the stipulations therein as to the measure of damages were valid because the grain was intended for export to a non-adjacent foreign country, and the shipments were consequently not within any of the classes of commerce to which the Federal statutes apply.   Evidence tending to support a larger measure of recovery was, therefore, excluded, and a verdict in favor of the defendant was directed   The exceptions in the record were taken on account of those rulings

In each of the bills of lading the consignment to which it refers is described as being "for export"   The record contains an agreed statement of facts from which it appears that each of the carloads of grain, "at the time it was so shipped and at the time it was destroyed," was "intended for transportation by railroad from" the place of origin "to Baltimore, Md., at which point it was to be unloaded from said

car into the elevators of the defendant at Baltimore, and thereafter loaded out of said elevators into a vessel, or vessels, for transportation by water from Baltimore, Md., to a point in Europe."

The Supreme Court of the United States, in a series of decisions, has settled the principle by which a question like the present one should be controlled. The intention as to destination with which the goods are delivered and accepted for conveyance by the carrier is held to be the determining factor in such a problem. Whether or not in a particular case the bill of lading discloses that the shipment is for export, if that was the real design with which it was started on the course of its transportation, and if it would proceed to a foreign destination as the normal result of the movement thus originated, it must be regarded and classified as foreign commerce for the purposes of such an inquiry as the one with which we are now concerned.

In the case of *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111, the question was whether a shipment of lumber from an interior point in Texas to Sabine, a seaport of that state, and intended by the purchaser for export, was subject as foreign commerce to the transportation rates authorized by the Interstate Commerce Commission to the exclusion of the lower rates imposed by the Railroad Commission of Texas. It was said in the opinion of the Court, as delivered by MR. JUSTICE McKENNA: "We have had occasion to express at what point of time a shipment of goods may be ascribed to interstate or foreign commerce, and decided it to be when the goods have actually started for their destination in another state or to a foreign country, or delivered to a carrier for transportation. *Coe* v. *Errol,* 116 U. S. 517; *Southern P. Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, 527." The Court overruled the contention that the shipment was not in foreign commerce because the railroad carrier's contract was fully and finally performed when the lumber was delivered at the seaport and a new and

independent contract was required for its movement beyond that point. "The determining circumstance," said the opinion, "is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accident, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle, and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transhipment at the seaboard; and if that may be made the point of ultimate destination by the device of separate bills of lading, the commerce will be given a local character, though it be essentially foreign." It was accordingly decided that the shipment there in question must be classified as foreign commerce and that the railroad carrier was entitled to charge the rates which the Interstate Commerce Commission had authorized.

The opinion from which we have quoted reviews earlier decisions by which its conclusion is supported. In *Southern P. Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, one of the inquiries was whether the jurisdiction of the Commission applied to shipments of cotton seed cake and meal from various points to Galveston, Texas, where the cake was to be ground into meal on the terminal wharves by the consignee, and the meal thus produced, together with that received by rail, was to be exported to foreign countries. The answer was in the affirmative, the opinion, by MR. JUSTICE MCKENNA, stating that "the manufacture or concentration on the wharves of the terminal company are but incidents, under the circumstances presented by the record, in the transshipment of the products in export trade, and their regulation is within the power of the Interstate Commerce Commission. To hold otherwise would be to disregard, as the Commission

said, the substance of things, and make evasions of the Act
of Congress quite easy. It makes no difference, therefore,
that the shipments of the products were not made on through
bills of lading, or whether their initial point was Galveston
or some other place in Texas. They were all destined for
export, and by their delivery to the Galveston, Harrisburg &
San Antonio Railway, they must be considered as having
been delivered to a carrier for transportation to their foreign
destination, the terminal company being a part of the rail-
way for such purpose."

The case of *Railroad Commission* v. *Worthington,* 225
U. S., 101, is also cited in the *Sabine Tram Co. Case* as illus-
trating the principle that "it is the nature of the traffic, and
not its accidents, which determine its character" for the pur-
poses of its classification as interstate or foreign commerce.
In that case the shipment of coal from Ohio mines to ports of
that state on Lake Erie for conveyance thence on lake vessels
was treated as interstate traffic notwithstanding the fact that
the coal was billed only to the points in the state from which it
would be subsequently shipped by water to other destinations.

The principle of the cases already cited was applied in
*Railroad Commission* v. *Texas & P. R. Co.,* 229 U. S. 336,
where the shipment of eighteen carloads of logs and staves,
under local bills of lading, from interior points in Louisiana
to New Orleans for delivery to the shipper's or consignee's
order, but intended for export, was held to be foreign com-
merce and subject as such to the Federal, rather than to the
state, regulation of freight charges. In disposing of the con-
tention to the contrary, the Court, speaking in this instance
also through MR. JUSTICE McKENNA, said: "The argument
is that the service rendered by the railroad companies was
wholly within the state and had 'no contractual or necessary
relation to foreign transportation.' It was, it is argued, 'man-
ifestly preliminary thereto, independently contracted for,
and not necessarily connected therewith.' And the principle
is urged that 'locality, therefore, determines the jurisdiction

(separation between Federal and state power) unless it is shown that though the local movement is actually within, it is legally outside the state.' To make the movement within legally outside of the state, appellants insist there must be bills of lading and other means of connection between the railroads and the ocean carriers. To make application of this principle, it is contended that 'not a single fact appears or exists, physical or other, which connects the railroads with the ocean carrier', and that the intention of the shippers or consignees is made absolutely controlling. To the principle urged, so far as its applicability to the case at bar is concerned, we may oppose *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498; *Railroad Commission* v. *Worthington,* 225 U. S. 101, and *Texas & N. O. R. Co.* v. *Sabine Tram. Co.,* 227 U. S. 111. In those cases there was necessarily a local movement of freight, and it necessarily terminated at the seaboard. But it was decided that its character and continuity as a movement in foreign commerce did not terminate, nor was it affected by being transported on local bills of lading. The principle enunciated in the cases was that it is the essential character of the commerce, not the accident of local or through bills of lading, which determines Federal and state control over it. And it takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country."

The decisions quoted from distinguish the case of *Gulf, C. & S. F. R. R. Co.* v. *Texas,* 204 U. S. 403, upon which the appellant here specially relies. The question in that case was whether the movement of two carloads of corn from Texarkana to Goldthwaite, both places being in the State of Texas, was to be regarded as interstate commerce on the theory that it was a continuation of a shipment of the corn from Hudson, South Dakota, to Texarkana, there having been a sale of the corn in transit to a purchaser who contracted and arranged for its delivery at Goldthwaite. It was held that

"the character of a shipment, whether local or interstate, is not changed by a transfer of title during the transportation," and that the interstate movement ended at Texarkana, which was its ultimate destination when it started from the point of origin in South Dakota. In the analogous case of *Chicago, M. & St. P. R. Co. v. Iowa,* 233 U. S. 334, Mr. Justice Hughes, speaking for the Court, said: "It is undoubtedly true that the question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract. * * * But the fact that commodities received on interstate shipments are reshipped by the consignees, in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement, or prevent the reshipment to a point within the same state from having an independent and intrastate character." The two cases last cited were plainly different in essential facts from the case at bar, but there is no inconsistency between the theory of those decisions and the principle by which the pending case must be governed.

The appellants cited the case of *Myers v. Baltimore County,* 83 Md. 385, in which cattle, brought to this State by dealers in regular weekly shipments for sale and export, were held not to be in course of transportation beyond the State while in the stockyards here awaiting sale by the owner to the domestic trade, or selection for the foreign market, but were "property within the State," and subject to assessment for taxation under the laws of Maryland. Several decisions of the Supreme Court to the same general effect were cited: *Kelley v. Rhoads,* 188 U. S. 1; *Pittsburg & S. Coal Co. v. Bates,* 156 U. S. 577, and *Brown v. Houston,* 114 U. S. 622. Those cases are all broadly differentiated by their facts from the one now under consideration.

It is conceded in this case that the eight carloads of grain, at the time they were shipped and when they were destroyed, were intended for transportation to Baltimore, there to be un-

loaded into the defendant railroad company's elevators, and loaded therefrom into vessels for export to Europe. The bills of lading themselves disclose that the shipments were for export. The plaintiffs acquired the bills of lading while the grain was in transit, and their purpose, as shown by their testimony, was to ship it abroad to fill orders for the European market. If, therefore, the grain had arrived in Baltimore, it would unquestionably have pursued the intended course of transfer to vessls by which it would have been carried to foreign ports. There is nothing in the record to suggest that there would have been any break in the continuity of the purpose by which the shipment was controlled from the time of its inception, or that there would have been any interruption of the processes by which the grain was to reach the holds of the vessels in which it was to be exported. The purchase of the bills of lading while the grain was in transit, merely affected the title to the shipment and made no change whatever in its movement or destination or in any of its commercial characteristics.

The facts of the case, in our judgment, bring it clearly within the principle of the decisions of the Supreme Court to which we first referred, and we, therefore, hold that the shipments of grain, for the loss of which additional compensation is sought to be recovered in this suit, were in course of transportation to a non-adjacent foreign country, at the time of their destruction, and that the measure of damages stipulated in the bills of lading is not contrary to the provisions of the Federal statutes but is a valid limitation of the carrier's liability for such a loss.

The appellant's contend that even though the validity of the provision as to the limit of liability be upheld, the railroad company is estopped from relying upon it because the appellants, notwithstanding their diligent inquiries, were not given notice of the loss of the grain for long periods of time, ranging from three weeks to seven months, after the various shipments were due to arrive in Baltimore. When the notice of

the loss was finally received, the replacement value of the grain was very much higher than at the time it should have reached the point of export in due course of conveyance. The delay in the notification that the grain was destroyed, and the loss resulting to the appellants from such delay, form the basis of the estoppel which is said to prevent reliance upon the stipulation in the bills of lading that "that amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the bona fide invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment."

The defendant is not estopped to invoke the limitation of liability in the bills of lading with respect to any loss to which the provision applies. The scope of its application is very broad, for it purports to restrict "any loss or damage for which any carrier is liable." A loss resulting from delay in delivery would be clearly within the class of losses to which such a provision refers. This was decided in *N. Y. P. & N. R. R. Co.* v. *Peninsula Prod. Exchange,* 122 Md. 215 (affirmed in 240 U. S. 34). In considering a limitation like the present one, we said in that case: "Unless the stipulation in the bill of lading is to be altogether disregarded, the carrier could not justly be charged with a greater loss to the property for delay in transit than would result from an absolute failure of delivery." If, in this instance, the shipments had been lost after a delay, however prolonged, in the course of the transportation, we could not have enlarged the contractual measure of damages, and we see no reason to hold that delay in giving notice of the loss should exempt it from the limitation of liability which the parties definitely agreed should apply to *any loss or damage* for which the defendant is chargeable.

*Judgment affirmed with costs.*