### TAD SCREEN ADVERTISING, Inc., v. OKLAHOMA TAX COMMISSION.

### No. 2401.

Circuit Court of Appeals, Tenth Circuit.
March 9, 1942.

Rehearing Denied April 14, 1942.

Roy C. Lytle, of Oklahoma City, Okl. (D. I. Johnston, Keaton, Wells & Johnston, and Henry S. Griffing, all of Oklahoma City, Okl., and Bennett & Wendelken, of Colorado Springs, Colo., on the briefs), for appellant.

C. D. Stinchecum, of Oklahoma City, Okl. (F. M. Dudley and A. L. Herr, both of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The question presented on this appeal is whether certain excise taxes laid on Tad Screen Advertising, Inc.,[1] under the Oklahoma Consumers and Users Tax Act, 68 O.S.1941 § 1231 et seq., infringed the commerce clause of the Federal Constitution, art. 1, § 8, cl. 3.[2]

Tad is a corporation organized under the laws of Delaware and is duly authorized to transact business in the states of Oklahoma and Texas. Its home office and manufacturing plant are located in Dallas, Texas, and it does not maintain an office or place of business in Oklahoma.

Tad is engaged in the business of manufacturing advertising motion picture films and in selling and furnishing film advertising service. Tad manufactures and keeps on hand at Dallas advertising films suitable for almost every type of business.

Tad sends its agents to various cities and towns in Oklahoma who negotiate agreements with local exhibitors for the running of film advertisements. If a satisfactory agreement is reached with the local exhibitor, a contract is signed by Tad's agent and the exhibitor and mailed to Dallas for Tad's approval. The contract provides that the exhibitor shall run Tad advertising films in a designated theater once during each performance and at a time when the theater is dark and the audience is seated; that Tad will solicit contracts for the display of such films and will pay the exhibitor certain specified amounts for running such films; that the exhibitor will return to Tad promptly all films at the end of their screening period; and that the contract shall not be binding upon Tad until countersigned by a studio official. When approved and countersigned by Tad at Dallas, a signed copy of the contract is forwarded by mail to the exhibitor.

After contracts have been made with exhibitors for the running of advertising films, Tad's agents solicit advertising contracts from local advertisers in Oklahoma. If a satisfactory agreement is reached with a local advertiser, a contract is signed by Tad's agent and the advertiser and mailed to Dallas for Tad's approval. The contract provides in substance that the advertiser orders a Tad Planned Campaign, consisting of a series of advertising films featuring a designated type of business; that the advertiser authorizes Tad to have such campaign displayed at certain intervals, in designated theaters, and that the contract shall not be binding upon Tad until countersigned by a studio official. When approved and countersigned by Tad at Dallas, a signed copy of the contract is forwarded by mail to the local advertiser. Tad attaches a trailer, giving the advertiser's name, address, and telephone number, to the end of a standard advertising film suitable for the type of business in which the advertiser is engaged and ships the film with trailer attached by parcel post or express from Dallas to a local exhibitor under contract with Tad. When the film has been run for the required period of time, usually one week, it is returned to Tad by the exhibitor and Tad forwards another film of the same series with the same or a

---

[1] Hereinafter called Tad.

[2] Sec. 4, Art. 10, ch. 66, O.S.L.1937 (Harlow) in part provides:

"(d) The terms 'gross receipts' or 'gross proceeds' shall mean the total amount of consideration received for the sale of tangible personal property and such services as are herein specifically provided for, whether received in money or otherwise, without any deduction therefrom on account of the cost of the property sold, labor service performed, interest paid, losses or any expenses whatsoever."

Sec. 5, Art. 10, supra, in part provides:

"There is hereby levied an excise tax of two (2%) per centum, except where a greater rate is hereinafter provided, upon the gross proceeds or gross receipts derived from the sale subsequent to May 31, 1937, to consumers or users, for use or consumption, of the following: * * *

"(j) Advertising of all kinds, types and characters, including any and all devices used for advertising purposes and the servicing of same."

Art. 11, ch. 66, O.S.L. 1939 (Harlow) contains substantially like provisions applicable after May 31, 1939.

similar trailer attached. Tad is paid monthly by the local advertiser according to the contract and remits monthly by check to the exhibitor the amount it has contracted to pay the latter for the running of the film.

The service to national advertisers is handled in a somewhat different manner. The following instances are typical:

1. Tad has a contract with General Screen Advertising, Inc.,[3] of Chicago, Illinois. The latter is authorized to enter into contracts for Tad with national advertisers. General enters into contracts with the advertising counsel for Chevrolet Motor Company [4] for a specified number of weeks of display of Chevrolet advertising films in certain named theaters under contract with Tad. Jam Handy Corporation of Detroit, Michigan, makes Chevrolet advertising films and forwards those covered by the contract with Tad to the latter at Dallas. Tad, in turn, ships them in proper rotation to the local exhibitors under contract with Tad, designated by the advertising counsel. These films are the property of Chevrolet and are returned to the Jam Handy Corporation when they have been displayed by the local exhibitors. Chevrolet pays Tad through its advertising counsel for such display.

2. A Tad salesman calls upon a local Goodrich Tire & Rubber Company [5] dealer and if the dealer wishes local advertising of Goodrich products, including the dealer's name and address on a trailer, the local dealer signs a contract form which is forwarded to Dallas. If approved by Tad, it is sent to the Alexander Film Company,[6] Colorado Springs, Colorado, which, in turn, submits it to the Goodrich branch office in that territory. If approved by Alexander and the Goodrich branch, Tad is notified of such approval, the contract is signed, and a copy is forwarded to the local dealer. Alexander makes the films advertising the Goodrich products and ships such films to Tad. Tad ships the films with the trailer attached to the designated local exhibitor who runs the films. The local dealer pays Tad for exhibiting the film but is reimbursed for a portion of the cost by Goodrich.

3. A Tad salesman calls upon a local Sinclair agent. If the local agent desires film advertising, he signs a contract and the salesman forwards it to Tad at Dallas. Tad, in turn, submits the contract to United Film Advertising Service,[7] Kansas City, Missouri. United submits the contract to the Sinclair branch in the territory in which the agent operates. If the Sinclair branch approves the contract, it returns it to United and the latter forwards it to Tad who formally accepts it and sends a copy to the agent. United provides the films and ships them to Tad at Dallas. Tad forwards the films to the local exhibitor designated in the contract, who runs the films. The agent pays half of the charge for the service and the other half is paid by Sinclair.

4. The Dr. Pepper Company [8] has contracts with various local bottlers throughout the United States. It permits the bottler to use the trade name and sells him the ingredients from which the beverage is manufactured. Tad's agent enters into a contract with the local bottler for film advertising and forwards the contract to Tad at Dallas. Tad sends the contract to Dr. Pepper's advertising agents. If the contract is approved by Dr. Pepper and its advertising agents, Tad is notified of such approval, countersigns the contract, and notifies the local bottler. The films advertising the beverage are manufactured by Tad. Tad forwards them to the local exhibitor designated in the contract, who runs the films. Dr. Pepper pays for the advertising service and makes an adjustment with the local bottler.

In each instance, Tad pays the local exhibitor, in accordance with its contract with the exhibitor, for running the films.

Tad does not manufacture any of the films used in national advertising campaigns except those advertising the products of Dr. Pepper.

The films used for local advertising are furnished by Tad from a standard stock which embraces films suitable for virtually every type of business. A film is not manufactured for a particular advertiser and its use is not limited to one advertiser. On the contrary, a film is susceptible of use and is used to advertise many local advertisers falling within a group or class for which the film is suited.

While it does not definitely appear from

---

[3] Hereinafter called General.
[4] Hereinafter called Chevrolet.
[5] Hereinafter called Goodrich.

[6] Hereinafter called Alexander.
[7] Hereinafter called United.
[8] Hereinafter called Dr. Pepper.

the record, we think it reasonable to assume that films manufactured by Tad for Dr. Pepper are suited for advertising and are used to advertise more than one bottler.

In certain instances, Tad manufactures and furnishes trailers which are usable only for the particular dealer named therein.

The Oklahoma Tax Commission demanded from Tad an excise tax in the amount of $2,029.90 for the period from June 1, 1937, to December 31, 1938, and the sum of $1,016.22 for the period from January 1, 1939, to October 15, 1939. After exhausting its administrative remedies, Tad, on February 5, 1940, paid to the Commission the sum of $3,838.39, which included the tax and $792.27 penalty. It brought this suit against the Commission to recover the amount so paid. From an adverse judgment, Tad has appealed.

Tad contends that the service rendered by it is interstate in character and that the imposition of the tax directly burdens interstate commerce. It asserts that the local exhibitor, in running the films in a local theater, acts as an independent contractor and that Tad is not engaged in furnishing advertising service in Oklahoma.

I

It is well settled that a producer or manufacturer who ships motion picture films from one state to exhibitors in another state to be exhibited by the latter is engaged in interstate commerce.[9] But when an article that has been transported in interstate commerce has arrived at a destination and is there held for use or disposal, it passes under the protection of state law and becomes subject to the taxing and police power of the state.[10]

Hence, we conclude the imposition of a tax upon the proceeds derived from the rendition of an advertising service

through the running of an advertising film and trailer at a local theater in Oklahoma does not regulate or impose a direct burden on interstate commerce.

II

In certain instances, Tad furnishes the advertising films and trailers and forwards them to a local exhibitor. In other instances, the advertising films are furnished by others and Tad merely forwards them from Dallas to the local exhibitor. The foregoing service is furnished by Tad outside of Oklahoma. But the primary service is the exhibiting of the advertising films in local theaters in Oklahoma. That is the service in which the advertiser is interested and that is the object he seeks by his contract with Tad. In furnishing films in certain instances and in forwarding those films and films furnished by others to the local exhibitor, Tad merely does that which is incidental to the primary service carried out through its subcontractor. In other words, Tad ships into Oklahoma a portion of the equipment provided by it or other film makers needed to perform the primary service, which is local in character, and there performs the primary service through a subcontractor. The service furnished at a local theater in Oklahoma is not changed by the incidental service into an interstate transaction. That which is merely incidental does not impart its character to that which is primary. On the contrary, that which is local in character remains a local transaction.[11]

The taxable event is the furnishing of the primary service in Oklahoma. We hold that event is local in character and subject to the taxing power of the state.

III

It must be assumed that some portion of the amounts received by Tad is for furnishing the incidental service. The

[9] Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Fox Film Corporation v. Federal Trade Commission, 2 Cir., 296 F. 353.

[10] Boynton v. Fox West Coast Theatres Corporation, 10 Cir., 60 F.2d 851, 853; General Oil Co. v. Crain, 209 U.S. 211, 228–231, 28 S.Ct. 475, 52 L.Ed. 754; Sonneborn Bros. v. Cureton, 262 U.S. 506, 43 S.Ct. 643, 67 L.Ed. 1095; Mutual Film Corporation v. Industrial Comm. of Ohio, 236 U.S. 230, 240, 241, 35 S.Ct. 387, 59 L.Ed. 552; Brown v. Houston, 114 U.S. 622, 632, 5 S.Ct. 1091, 29 L.

Ed. 257; Fox Film Corporation v. Trumbull, D.C., 7 F.2d 715, 722.

[11] Browning v. Waycross, 233 U.S. 16, 19–23, 34 S.Ct. 578, 58 L.Ed. 828; General Railway Signal Co. v. Virginia, 246 U.S. 500, 509, 510, 38 S.Ct. 360, 62 L.Ed. 854; State v. Tad Screen Advertising Co., 199 Ark. 205, 133 S.W.2d 1, 2, 3; Ligon v. Alexander Film Co., Tex. Com.App., 55 S.W.2d 1030, 1031, 1032, certiorari denied 289 U.S. 760, 53 S.Ct. 793, 77 L.Ed. 1503. Cf. York Manufacturing Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963, 11 A.L.R. 611.

question arises, may the tax be measured by the gross proceeds received by Tad, including that which it receives for the incidental service as well as that which it receives for primary service. We are of the opinion that, since the service rendered outside of Oklahoma was merely incidental to the primary service and amounted to no more than the furnishing of a portion of the equipment required to perform the primary service, apportionment of the gross proceeds is not required, and that the tax may be lawfully laid upon the entire gross proceeds.

■ Tad contends that if Oklahoma may levy a tax upon the event of furnishing the primary service, measured by the gross proceeds received from the entire service, then Texas may levy a tax upon the event of rendering the incidental service measured by the gross proceeds received from the entire service, and that the tax is invalid under the doctrine laid down in Adams Mfg. Co. v. Storem, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429, and Gwin, White & Prince, Inc., v. Henneford, 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272. We think that conclusion does not follow because the service rendered in Texas is merely incidental to the primary service and is interstate in character.

We think the situation presented is more analogous to that presented in McGoldrick v. Berwind-White Coal Min. Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876. There, the tax was sustained upon the event of the sale or delivery of coal in New York, although the seller, in order to carry out his contract of sale, produced the coal in Pennsylvania and transported it to New York. We think to measure the tax on the gross proceeds received for the entire service in the instant case results in only an incidental effect on interstate commerce.

■ Furthermore, Tad did not request an apportionment of the tax, but challenged the validity of the tax in its entirety.

IV

■ The question remains, Did Tad furnish the primary service? Where a third person occupies the relation of independent contractor to his employer, the law recognizes certain limitations upon the liability of the employer for torts committed by the independent contractor. We do not think those limitations are applicable here where the question is one of tax liability. Here, Tad contracted with local and national advertisers for the furnishing of advertising service through the running of advertising films in local theaters in Oklahoma. Tad was primarily responsible to the advertisers for the furnishing of such service. It did not contract to employ others to furnish the service, but to furnish the service itself. The advertiser paid Tad for the service. The mere fact that Tad employed a subcontractor to actually perform the service did not change its obligation to the advertiser. We hold that Tad furnished the service to the advertiser, received the compensation for such service, and is liable for the tax laid on the gross proceeds derived from the furnishing of such service. This view is supported by the adjudicated cases.[12]

The judgment is affirmed.

---

[12] State v. Tad Screen Advertising Co., 199 Ark. 205, 133 S.W.2d 1, 2, 3; Ligon v. Alexander Film Co., Tex.Com.App., 55 S.W.2d 1030, 1031, 1032, certiorari denied 289 U.S. 760, 53 S.Ct. 793, 77 L. Ed. 1503; Alabama Western R. Co. v. Talley-Bates Const. Co., 162 Ala. 396, 50 So. 341, 344; Imperial Curtain Co. v. Jacob, 163 Mich. 72, 127 N.W. 772, 774; Phillips Co. v. Everett, 6 Cir., 262 F. 341, 344, certiorari denied 252 U.S. 579, 40 S.Ct. 344, 64 L.Ed. 726.